## SUPERIOR COURT OF BALTIMORE CITY

Filed December 22, 1892.

SUSANNA CROCKETT, ET AL.,

VS.

HENRY B. DAVIS, EXECUTOR, ET AL.

*Samuel S. Field* and *John F. Gontrum* for caveators.

*Bernard Carter* and *D. Meredith Reese* for caveatees.

RITCHIE, J.—

Catharine Davis, being then a widow, executed her will on the 13th day of August, 1890. She, at that time, had living four children by her first marriage and three children by her second marriage. A caveat has been filed to the will by the children of the first marriage; Mrs. Davis having left nearly all of her estate to the children by her second marriage.

Four issues have been sent to this Court to be passed upon; they involve the due execution of the will, the knowledge upon the part of the testatrix of its contents, the exercise of undue influence, and testamentary capacity. Its due execution has been proved, and there is no controversy over the factum of the will; that being so, the testatrix is presumed to have had knowledge of its contents, provided she had mental capacity sufficient to make a will. The caveatees, before offering any testimony, have asked the Court to instruct the jury that, on the case made out by the plaintiffs, there is no evidence legally sufficient, upon the remaining two issues of duress and testamentary capacity, to go to the jury, and I am obliged to grant this instruction. In doing so, it is due to the able argument made by Mr. Field upon behalf of the caveators, that I should give a little more fully than I otherwise would, the reasons for my ruling.

The rule as to the legal sufficiency of testimony has been repeatedly stated by the Court of Appeals. As concisely laid down in Tyson's case, it is that the Court ought not to allow a case to go to the jury unless the evidence is of such a character as would warrant the jury, in the exercise of a reasonable intelligence, in finding the fact alleged. As applied to this case, there must be evidence which would warrant the jury, in the exercise of a reasonable intelligence, in finding either the exercise of undue influence, or the want of testamentary capacity. Or, adapting the language used in Foy's case, there must be evidence upon which the jury might reasonably and properly conclude that there was the exercise of undue influence, or that there was the want of mental capacity. If there is no such evidence, it is the duty of the Court to so rule. This is the law that is given to me, and I must follow it according to the best of my judgment.

First, as to the issue of undue influence. This lady was sixty-five years of age at the time she executed her will; the evidence shows that during all her life she had been a woman of more than usual power of will and firmness of character. There is no suggestion, at least no suggestion of any importance, that she became deficient in this respect, until after the death of her husband, which occurred in April, 1890, four months before the execution of her will. It is in testimony that at that time she began to show the effects of a life of much hard work, that her health had somewhat failed, and, in general terms, it is testified to that during the period between the death of her husband and the date of the execution of her will, she was easily influenced, was easily persuaded. These are the expressions used by the witnesses who testify on this point, that she could be easily persuaded that she could be during the period in question, easily influenced. But there is no evidence whatever in the case to show that any one ever did exercise any influence over her, that any one ever attempted to exercise any influence over her, or that

she was, in fact, ever subject to the influence of anybody; there is no instance given by a single witness, which under the rule governing the sufficiency of evidence, would tend to show that she was ever subject to any undue influence from any quarter.

Of course, in connection with other testimony on the issue of undue influence, the provisions of the will may be considered, and I will refer to them a little later. It has also been argued by the caveators that there is such gross inequality in the dispositions of the will as to change the onus, and make it incumbent on the beneficiaries to show affirmatively that the testatrix was free from undue influence. This practically invokes by analogy the doctrine of confidential relations as applied in equity to gifts *inter vivos*. I do not think the facts of this case bring it within any of the authorities cited on this point, but even if they did, I do not think those cases, in view of what is held by the Court of Appeals in Tyson's case and Griffith's case, would be accepted as authority in this State.

Now as to testamentary capacity. In order to be competent to make a will, a testator must be of sound and disposing mind, and capable of making a valid deed or contract. When we come to the consideration of this issue, the field that may be covered is a very broad one; almost anything connected with the testator may be properly taken into consideration; age, health, estate, family, the condition and necessities of the different members of his family, the relations existing between him and them, the claims that any may have upon his bounty, and all the surroundings of the testator may be considered, so far as they throw any light upon the question of mental capacity.

We find that the first husband of Mrs. Davis, Mr. Jenkins, died in 1861; the children by her first marriage are the caveators; in 1862 she married Mr. Davis, who died in April, 1890; the three children by the second marriage are the beneficiaries under her will: she made this will on August 13, 1890, and died in February, 1892. She is shown to have been a capable business woman; she was active, industrious, and intelligent: and the testimony upon all sides is that she was a clear-headed

and more than usually competent business woman, at least down to the very latest years of her life. Such was her mental character during all the active period of her life.

It is claimed first, that there is evidence of want of mental capacity in the provisions of her will, that its provisions are unnatural and unjust. It is hardly necessary to say that if a testator is of sound mind and free from undue influence, he is at liberty to make any disposition of his property that he sees proper, consistent with the policy of the law, and Courts have no right, they have no power to control the disposition that any testator—who is free and competent—may see proper to make of his property. His right to dispose of his property by will is just as ample as his right to dispose of it by deed during his life. We have no right to make wills for people, or to set aside those made simply because to us they may seem unjust or injudicious. The provisions of the will, however, read in the light of surrounding circumstances, and in connection with them, may of course be considered in passing on the question of capacity. But we should act very cautiously in forming an opinion of mental unsoundness because of the provisions of any will. It is important to remember that the testator is not here to explain his motives. The effort in an inquiry of this kind is to place the testator before the jury just as he was when he made his will; to show not only his actual situation and surroundings, but also, as far as possible, his thoughts and feelings and all considerations which may have influenced his action. But with all our effort this can be only imperfectly done. The law does not require him to assign his motives for the will he makes. Very few men discuss their proposed wills with others unless in the utmost confidence, and the law recognizes the fact that a testator may often have sufficient reasons for discrimination, or for unexpected dispositions, which he would be reluctant to disclose. Cramer vs. Crumbaugh, 3 Md. 499. Hence it is, that in considering the provisions of a will in connection with the question of undue influence or capacity, the fact should always be borne in mind that, if it were possible to have it, one word from the testator might make

clear what to us seems obscure, or justify what to us seems unjust.

What then was the situation in the light of which these provisions are to be read? Is there anything unnatural or unjust in the provisions of this will when read in connection with the surrounding circumstances? In taking in the whole situation on this point we must go back a little—rather in the first place, let us see what is the amount of her estate? The inventory shows about $17,000 of personal property; there were also several small fee-simple lots, the value of which according to the statement of counsel would probably amount to eight or ten thousand dollars; so that we thus have an estate of about twenty-six or twenty-seven thousand dollars. The amount of this which she gives to her children by her second marriage is about $20,000. About $7,000 of her estate is undisposed of by will, there being no residuary clause. Now one important consideration right here is, where did her property come from? If her property came in a very large degree from her second husband, we see at once that there is nothing unreasonable in her leaving the most of it to the children from whose father she got it.

Now, going back some years, we find that at the time of her first husband's death in 1861 she was not worth a dollar. He had been unfortunate in his business a short time before his death, and lost every cent he had, and she had contributed to the payment of his debts every bit of property which she at that time owned. So that, at the time of his death she was worth nothing at all. Within ten months after his death she married her second husband, Mr. Davis. During those ten months she was keeping a little store, and there is no evidence that she accumulated any property at all during that brief period. When she married Mr. Davis, it is in evidence that he at least owned some property, he owned the house in which Mrs. Davis lived and carried on her business. He also owned another; so that she had nothing and he certainly had something. It further appears from the evidence that the entire estate owned by her at her death consisted of property acquired from or through her second husband, and of property accumulated during their joint married lives by their joint industry and thrift. Whether Mr. Davis at the time of his marriage, owned any other property than the two houses mentioned, or not, does not appear; nor does it appear what additional property, if any, he acquired after his marriage; but we have at least these two pieces, now forming part of her estate, and it is also shown that on his death she got, by insurance or in some other way through him, the sum of twelve or fifteen thousand dollars in money. It does not appear when she acquired full title to her houses, nor what was done with most of this cash. It possibly went to some of the building associations referred to; but at any rate it seems to have been absorbed into her estate.

It thus seems that probably two-thirds or more of the entire estate which she left was directly derived from Mr. Davis. So that while it is true that, of that portion of her estate which is disposed of by will, she leaves nothing to the first set of children, it is also true that what she leaves to the second set seems to be in and about the amount which came directly from their father, while the amount undisposed of by will, and which will go to all in common, seems to be in and about the amount accumulated during their joint married lives. When the provisions of the will are capable of such a reasonable explanation, it cannot be that the mere fact of inequality is any evidence of the want of capacity.

Another thing to be considered in connection with the provisions of the will, is the relative dependency, and relation toward her, of the two sets of children. The first set had married and had been separated from her for many years before her death; Mrs. Pritchard married in 1863, Mrs. Powell and Mrs. Crockett in 1870, and Mrs. Rice in 1876. There is nothing to show that any of these four children were in need, or that they were not perfectly comfortable. The husbands of all of them were living at the time of the execution of the will, and the husband of Mrs. Powell, at least, had some property, because she testified that in 1891, when her husband died, she consulted with her mother with regard to the settlement of his estate. We thus have the sources from which, at least, most of this estate must have come; the fact of the long separation of the

first set of children from their mother; the further fact that there is no evidence to show that they were in needy circumstances, or were not perfectly comfortable; that at the time the will was made, they all had husbands upon whom they had a right to depend; and also the fact that the second set of children were comparatively young and had composed her household during the later years of her life. So that, read in the light of the sources of her property, of the relative circumstances of the two sets of children, and of her relations to them, the provisions of the will show no unreasonable inequality, and much less any inequality which would indicate a want of capacity.

We come now to the direct testimony on the question of mental capacity, and what does it all show, what is the substance of the whole of it? There is no question about her mental capacity up to May 31, 1890, the time of the filing of the caveat to the will of Mr. Davis by the children of his former marriage. That her mind, up to that time, was perfectly sound and clear, was distinctly testified to by Dr. Pritchard, her son-in-law, and husband of one of the caveators. The period covered by the testimony of alleged capacity, is the period between the 31st of May and the 13th of August, the date of the will, and the sum and substance of the whole testimony is—leaving out for the moment the opinion expressed by Dr. Pritchard—the substance of the whole testimony so far as facts are concerned, is as follows: that she was older; she was more feeble; she showed she had been overtaxed by work; she was nervous; she was excitable; she was subject to gastritis at times; she had been treated for malaria; she was somewhat forgetful; she was not the same woman that she used to be; she had headaches; she was fretful, and she was complaining. Now this, as far as the facts go, covers, I think, the entire testimony submitted by the caveators. It cannot be contended, I think, that upon this evidence a jury could reasonably find that there was a want of mental capacity. And it is to be remembered right here that nearly all of these things existed before the death of Mr. Davis—she was subject to gastritis; she was nervous; she had malaria; she was fretful; she was more feeble; she

was excitable before the death of Mr. Davis—as well as during the summer of 1890. These things had not affected her mind before; why are we to suppose that they began to affect it just at the time when it is important for the caveators to question her capacity? She had shown these physical or nervous conditions and had been subject to attacks of gastritis for many years, but on the testimony of the plaintiffs her mind was perfectly sound up to the time of the filing of that caveat. But in all this general testimony there is not a single instance testified to in which Mrs. Davis ever did or said a thing that indicated any want of mental capacity. There is no evidence that, during her whole life she ever did or said a thing that might even be called eccentric. They say she was sometimes forgetful; but there is not a single instance of a lapse of memory testified to, to which the most intelligent and well-balanced people might not be subject.

Let us now consider the testimony of Dr. Pritchard. He testifies with the other witnesses as to the matters of fact already referred to, and also that she came to his office on the 1st of June, the day after the caveat was filed, very much excited, very much alarmed, very apprehensive of what might be the result of that litigation, and that she continued to be much disturbed by this caveat. But, it is said, he is a practicing physician, and also expresses an opinion as to the mental capacity of Mrs. Davis at the time she made her will. He testifies that, in his opinion, during the period in question, and on August 13, 1890, she was not of sound and disposing mind, and was not capable of executing a valid deed or contract, and the plaintiffs place much stress upon that opinion as being that of an expert. But, while he expresses this opinion, he states very fully the grounds on which it was founded. The caveators contend that the opinion of an expert is substantive testimony and necessarily takes a case to the jury. I do not think so. There are many cases in which the Court is not qualified to judge the value of the opinion of an expert, but if on the direct or cross-examination he states all the grounds upon which his opinion is formed, and they are not of a scientific or expert

character, then the Court can judge of its value, as well as it can of that of a non-expert witness. If the grounds of his opinion are of such a character as that persons of ordinary intelligence and information can estimate their force; if they are just such facts as a non-expert is permitted to express an opinion on, then the Court is just as capable of forming a judgment on them as he is, and if, in the judgment of the Court, his opinion in such a case is based upon reasons altogether insufficient, then it is of no additional value, because he happens to be an expert. If an expert were to express an opinion that a testator was of unsound mind, and should give as the grounds of such opinion such reasons as were given by the witnesses in the case in 7th Maryland, that is, that the testator held different political opinions from the witness, or that he did not know the good qualities of a horse, could it be claimed for a moment that such an opinion was of any value because the witness was an expert?

In the grounds given by Dr. Pritchard for his opinion there is nothing scientific, there is nothing that it requires expert knowledge to understand. He testifies to the facts already mentioned, and states that his opinion is founded upon them. But unless there is some occult relation between headaches, excitability, occasional forgetfulness, gastritis and malaria on the one hand, and mental capacity on the other, which persons of ordinary intelligence cannot comprehend, I cannot see that his opinion is of any more value than that of any one else, and, in the absence of such occult relation, I cannot think that any intelligent person could reasonably find mental incapacity from the facts stated. Now then, when Dr. Pritchard is asked why these things should have made Mrs. Davis of unsound mind, he endeavors to show the relation between them and the mind, and answers that no one's mind can be clear who is sick; that her health was impaired and she was subject to gastritis, and you cannot have a sound mind unless you have a sound body. But no value can be at-

tached to such a test of mental capacity; it contradicts all common observation and experience, for we know that a perfectly sound mind is frequently found in an unsound body, and that frequently the mind is perfectly clear although the person is sick. Under such a test no will would be valid unless made when the testator was in robust health. The stomach may be—as he expresses it—the government of the intelligence, but it does not follow that occasional attacks of gastritis, or inflammation of the stomach, will so impair the mind as to destroy testamentary capacity. If wills are to run the risk of being set aside on such grounds, no man's will would be safe.

This opinion of Dr. Pritchard's, moreover, such as it is, was expressed under an erroneous impression as to the facts. When he gave it he thought that she had suffered very much during June and July from gastritis, and this supposed fact was most particularly mentioned by him as a reason for his opinion. He could not, when first examined, state the number of attacks, but said that his journal would show the times of the repeated visits which he thought he had paid her during this summer for her attacks of gastritis. When his journal was produced, however, it failed to show that he had paid her a single professional visit, or had given her a single prescription, for any purpose whatever during the whole of the year 1890, and there is no evidence that she had any gastritis or malaria from the time her husband died until she made her will. Thus the ground to which Dr. Pritchard attached the most importance, in expressing his opinion, her supposed sickness from gastritis during the summer of 1890, and its effect upon he mind, did not in fact exist.

One word as to the testimony of Mrs. White. I think it is important because of the light it reflects upon her capacity when Mrs. Davis made her will. She makes this will on the 13th of August, and at that very time she is making arrangements for an extended trip north; going on account of her health, it is true, going because she has been

worried by the contest over her husband's will, has been complaining more or less and is run down; but she is making perfectly intelligent and proper arrangements for this trip. Nobody helps her in her preparations. Her friend, Mrs. White, goes with her, but not to take care of her, not as an attendant, not because she needed anyone to look after her or to watch over her, but is so happens that Mr. White had some time before suggested this very trip to his wife, and they go together because it is convenient and agreeable for both to do so. They start on the 14th of August, the day after the execution of this will. Mrs. White is with her in the most intimate possible way for four weeks, with her day and night, in her company all day, occupying the same room at night, with this abundant opportunity to observe and detect the slightest indication of mental weakness, she is not able to testify to a single thing which showed in the slightest degree any want of mental capacity. It is difficult to believe that Mrs. Davis could on the 13th of August, and for weeks prior thereto, have been of such unsound mind as not to be able to attend to ordinary business affairs, or to execute a will, when it is shown, that for weeks immediately thereafter she was most intimately associated with an intelligent friend and did not betray during all this time a single sign of mental weakness, nor by act or speech excite any suspicion of want of intelligence.

I have listened very carefully to all the testimony in this case, and I cannot see how a jury could reasonably find from it either the exercise of undue influence or the want of mental capacity. I am always reluctant to take a case from the jury, and always endeavor to fully respect its province; it is also personally more agreeable to let responsibility rest upon others; but the Court has its province as well as the jury, and when in its judgment there is no legally sufficient evidence, it must, when appealed to, meet the responsibility and so rule. That the Court should pass on this question when properly raised, is just as much a feature of our judicial system as is the trial by jury. The prayers of the defendants will be granted.