## AMOS CRAMER *vs.* GIDEON D. CRUMBAUGH.

The law concedes to a man of sound mind, the right to dispose of his property in any manner he may deem proper, consistent with its policy, either by gift or devise, and it is no valid objection to a will, that the testator has given his property to strangers to his blood, provided he had the required mental capacity, and was free from undue influence.

Though a will may by its provisions furnish intrinsic evidence involving it in suspicion, and tending to show the incapacity of the testator to make a disposition of his estate with judgment and understanding, such as a disposition of his whole estate to the exclusion of his near relations, yet this would not furnish *per se* sufficient ground for setting aside the instrument.

The reading of the will in the presence of the attesting witnesses is not essential to the validity of its execution: where the capacity of the party is wholly unimpeached, and an absence of proof of fraud, the law presumes a knowledge on the part of the testator of the contents of the paper which he executes.

The fact that a will was written by the executor named in it, and he and his son were the chief objects of the testator's bounty, would very properly suggest suspicion as to fairness, in a case where the whole property is given to strangers to the blood of the testator.

The *onus probandi* is on the party propounding the will, and it is in general discharged by proof of capacity and the fact of execution: from these, knowledge of, and assent to, its contents are presumed, and the mere fact that the person who prepares it is himself a legatee, cannot in every case and under all circumstances create a contrary presumption, and compel the adduction of additional evidence of knowledge and assent

A will was written in the testator's own house, in pursuance of his previously declared intention to have his will prepared by a certain person, and executed on a particular day; he had ample time and opportunity to dictate and examine its provisions after they were put to paper. There was no proof

of undue influence, and his capacity was fully established and there was ample proof of execution, the testator having sent for the witnesses the day previous, and explained to them the purpose for which they were summoned. HELD:

That this was a valid will though prepared by a party who was benefited by it, and the whole estate given to strangers to the blood of the testator, and was not read to the testator in the presence of the witnesses before it was executed.

Witnesses were sent for, for the purpose of attesting a will, and it was signed by the testator in their presence, and they subscribed their names in his presence and in the presence of each other, and after this the testator in reply to a question whether it was his last will and testament, "assented or nodded his head." HELD, that this was a valid execution and attestation of the will.

APPEAL from the Orphans Court of Frederick county.

This appeal is from an order of the orphans court admitting to probate a paper purporting to be the will of John Cramer, executed on the 21st of October 1852.

By this paper the testator manumitted two of his servants, and devised to his brother Amos Cramer, and his wife and their two children, one dollar each, that being the "full amount I wish them to have of my estate." He then devised "all his property, real, personal and mixed, except my horse Davy, unto Margaret Smeltz during her lifetime," and at her decease his executor was to pay unto Margaret Louisa Smeltz the sum of $100, and no more, "and then all of the property both personal, mixed and real, to descend to George F. B. Crumbaugh his heirs or assigns, or if he should die before the decease of Mrs. Smeltz, leaving no legal heirs, it is my further desire and wish that G. D. Crumbaugh or his legal heirs, have the same for their proper use and behoof forever." He then gave his said horse immediately after his death to G. F. B. Crumbaugh, and appointed Gideon D. Crumbaugh his executor. The paper was signed and sealed by the testator, and the attestation clause was as follows, "signed, sealed, published and declared by John Cramer of A, the above named testator, as and for his last will and testament, in the presence of us, who, at his request and in his presence, and in the presence of each other, have subscribed our names as witnesses thereto," and was attested and sub-

scribed by three witnesses, George M. Potts, Emanuel Smith and Eneas Hedges.

The appellant, the brother and sole heir at law of the testator, filed a *caveat* to this will upon the grounds stated in the opinion of this court

The will was written by said Gideon D. Crumbaugh, who was the father of the legatee, G. F. B. Crumbaugh, and executed under the circumstances and in the mode described by Smith, one of the attesting witnesses, whose testimony is fully given in the opinion of this court, in which all the other material facts of the case are also stated. Upon the evidence, the orphans court ordered the will to be admitted to probate, and from this order the caveator appealed.

The cause was argued before LE GRAND, C. J., ECCLE-STON, MASON and TUCK, J.

*Wm. P. Maulsby* for the appellant, argued for a reversal, on the following grounds:

1st. When a party who writes a will takes a benefit under it, that fact will excite the suspicion of the court, and induce it to be jealous and vigilant in examining the proof, and to require the strictest proof of the legal sufficiency of the execution of the paper, before it will admit it to probate. The *onus* is upon the party propounding the will, and the circumstance stated increases the burden, and renders necessary other and different proof from that which is required, where no such circumstance has occurred. 1 *Jarman on Wills* 44, and note. *Barry vs. Butlin*, 1 *Curteis*, 614, 637; 6 *Eng. Eccl. Rep.*, 409, 417.

2nd. The paper ought not to be admitted to probate, because there is no evidence that *Cramer*, (the deceased,) knew its contents, and the *onus* is upon the appellee. 1 *Jarman*, 44, 45, 46. If the testator did not read the will, and it was not read to him, it must be shown that he was made acquainted with its contents and approved them. 2 *Green Ch. Rep.*, 549; *Day vs. Day*. 1 *Curteis*, 397 and 637; 6 *Eng. Eccl. Rep.*, 350, 437. 1 *Mass.*, 257.

3rd: The mere signature of a will by a testator, is not a sufficient execution to pass real estate.—There must be a *publication* by the testator, and the subscribing witnesses must "attest," not only the signing by the testator, but also the declaration or publication by him of the instrument, as and for his last will and testament. That attestation of signature alone is insufficient: see 1 *Powell on Devises*, 80, 81, 82. *Wallis vs. Hodgeson*, 2 *Atk.*, 56. That there must be a publication by the testator, and attested by witnesses:—1 *Powell on Devises*, 90. *Ross vs. Ewer*, 3 *Atk.*, 156, 161. *Moodie vs. Reid*, 7 *Taunt.*, 361, 354. *Doe vs. Burdett*, 4 *Adolp. and Ellis*, 1. *Swift and wife vs. Wiley*, 1 *B. Monroe*, 114, 117. *Gerrish vs. Nason*, 22 *Maine Rep.*, 438, 441. *Sweet, et al., vs. Boardman*, 1 *Mass.*, 257, 261, *et seq. Rutherford vs. Rutherford*, 1 *Denio*, 33, 35. *Remsen vs. Brinckerhoof*, 26 *Wendell*, 325, 330. *White vs. British Museum*, 6 *Bing.*, 310. *Wright vs. Wright*, 7 *Bing.*, 457. In both these last cases the will was in the handwriting of the testator, and produced by him to the witnesses. 6 *Cruise's Digest, title Devise.* Signing a will is analogous to sealing a deed—and publication of a will to the delivery of a deed. 1 *Powell on Devises*, 94. The assent of a testator given by a nod, to the question, whether the paper was his last will, or act and deed, is not a sufficient publication, because, if otherwise sufficient, it was given after the paper had been signed and attested, and the attestation subscribed by the witnesses. When the witnesses subscribed it was to that which they had attested, to wit, the naked signature of the testator. Nor can a publication be inferred from the silence of the supposed testator, when the appellee informed him that the will was ready, before the execution thereof, because such inference is rebutted by the proof, that it was not read to or by him. Nor can such an inference be drawn from the fact, that the testator had, on a previous day, requested the witness to come to his house for the purpose of witnessing his will, because it is proved, that when he made such request the paper had not been prepared. It was not in his possession and produced by him to the witnesses, from which a knowledge of the contents and substantial publication

might have been presumed, but was prepared on the day when it was signed and was in the possession of, and produced by, the party who prepared it and who took an interest under it; and whose son ultimately was to receive under it the whole estate, to the exclusion of the brother and heir at law. It must appear, not that Cramer *intended* to make a will, but that the *particular paper* offered for probate is his will, executed with all the solemnities required by the law.

4th. The policy of the laws of this State, in regard to the transmission of the title to real estate by deed, would seem to indicate stronger reason for such a construction of the act of 1798, chap. 101, as to make *publication* necessary to a will devising lands, than existed in England for a similar construction of the act of 29 *Charles*, 2.

*Joseph M. Palmer* for the appellee.

1st. The requirements of the statute, regulating the mode of executing last wills and testaments of lands, &c., have been fully complied with in this case, and the will in question was properly admitted to probate. The great and leading object of our act of Assembly is, that the will should be executed by a person of *sound* mind, memory and understanding. When it is shown that a man is of sound and disposing mind, he is presumed to know what he is doing.

2nd. The attestation clause in the will of Cramer, subscribed by the three attesting witnesses, is *prima facie* evidence of the facts therein contained as attested to; hence, it becomes the duty of the caveator to repel, by evidence, the facts stated in said attesting clause, all the attesting witnesses having proved the testator to be of a sound and disposing mind, and capable of making a valid deed and contract at the time of executing said will. 36 *Eng. C. L. Rep.*, 329.

3rd. The statute of 29 *Car.* 2, *ch.* 3, regulating the execution of wills of lands, of which the act of Assembly of Maryland, on that subject, is a transcript, is silent as to the delivery, publication or any other formal act by which the testator is to signify his adoption of the instrument as a will, there-

fore, signing the will and causing it to be attested by witnesses as required by the statute, is sufficient, and no formal words of publication are necessary. 7 *G. & J.*, 316. 2 *Greenleaf's Ev.*, 633. 1 *Jarman on Wills*, 71. 4 *Kent Com.*, 515, 516. *Ward vs. Swift*, 1 *Crompton and Meeson*, 171. *Moodie vs. Reid*, 7 *Taunt.*, 362. *Wright vs. Wright*, 7 *Bing.*, 457. *White vs. The British Museum*, 6 *Bing.*, 310. *Small vs. Small*, 4 *Greenleaf's Rep.*, 220. The law on this subject of publication has been changed in England and New York by statute, but not in Maryland. In New York publication is made absolutely necessary to the validity of a will. 8 *Paige*, 488, 489. 26 *Wend.*, 325, 330.

4th. Even if it be necessary in this State to prove, that the testator published the paper signed and attested to be his will, it is not necessary that the acknowledgment should be proved by direct evidence, it may be inferred from all the facts and circumstances surrounding the transaction. 1 *Powell on Devises*, 91, 92. *Wallis vs. Wallis*, 4 *Barnes' Ecc. Law*, 114. *Black vs. Ellis*, 3 · *Hill (S. C.,) Ch. Rep.*, 68. *Clarke vs. Dunnavant*, 10 *Leigh's Rep.*, 13. 9 *B. Monroe*, 29. No particular form of publication being necessary, delivery, as a deed, has been held a sufficient publication of a will. 1 *Powell on Devises,* 91. 8 *Vin. Abr.*, 125. *Pl.*, 13. *Loy vs. Kennedy*, 1 *Watts and Serg.*, 396. In New York, where, by statute, actual publication is made necessary, the requirements of the statute may be presumed from facts and circumstances. 8 *Paige*, 488. 26 *Wend.*, 325, 330.

5th. In point of fact, in this case, there was an actual publication of the will, and the subscribing witnesses subscribed the attestation clause in the presence of the testator and in the presence of each other and at the request of the testator, they all having been sent by the testator to meet at his house on the very day of the execution of the will, for the express purpose of witnessing the said will; and they all met in pursuance of said request, and did actually attest and subscribe said will, after having seen him sign it, and at the same time he, the testator, having been told that his will was ready for

Cramer *vs.* Crumbaugh.

execution and that he must sign first, declaring it to be either his will or his deed, as sworn to by Hedges and Smith; and after the will was executed and attested, the said will was sealed up, *as a will,* in the presence of the testator and delivered to Crumbaugh for safe keeping, at the request or approbation and consent of testator, as his will.

Mason, J., dissented in part, and delivered the following dissenting opinion:

In the views expressed by the chief justice, upon the first four heads or divisions into which he has divided this case, I concur. Upon the fifth I dissent. I do not think there is sufficient evidence in the record to establish, that the testator had any knowledge of the contents of the paper at the time he affixed his signature to it as his last will and testament.

If Crumbaugh had taken no beneficial interest under this will, all the presumptions and legal intendments would have favored the validity of the will, and I would not have hesitated to have pronounced it good. While it is clear from the proof that the deceased intended to make *a will,* it is by no means clear to my mind, that the paper actually executed was *the will* which he wanted to make. Is it not manifest, that any other paper could as easily have been imposed upon the testator as the will he wanted to sign, and which he supposed he was signing? In other words, does the record furnish any evidence, or any facts, from which a reasonable presumption would arise, that the contents of this paper were known to Cramer, or that it was drawn in accordance with his directions?

I do not intend to intimate that any particular kind of proof is necessary, where the scrivener takes a benefit under the will, to show the actual knowledge of its contents by the testator; but in some way, other than the mere legal presumptions which usually favor duly executed testamentary papers, I think it should appear that the party signing the supposed will knew its contents.

The error in the court's opinion in this case I conceive to

63      v.3

consist in the circumstance, that while it is conceded "that if a party," (according to *Baron Parke*, in the case in 1 *Curteis*,) "writes a will under which he takes a benefit, that is a circumstance which generally ought to excite the suspicion of the court," &c., yet, in fact, such a case is not sufficiently distinguished from the case of an ordinary will.

The learned judge, whose opinion is relied on and cited by the majority of the court, when he says, "these are cases of wills, prepared by a legatee so pregnant with suspicion," &c., embraces the case now before us, and that without clear proof of the actual knowledge of the contents of the paper by the supposed testator, the will ought not to be sustained.

In addition to the other suspicious circumstances attending this transaction, the fact that the legatee and scrivener, at his own instance, became the depository of the paper, ought to determine the case against him. At no time then had the testator an opportunity of discovering whether a fraud had been practised upon him, (if such was the fact,) by referring to the paper.

Le Grand, C. J., delivered the opinion of this court.

This is an appeal from an order of the orphans court for Frederick county, admitting to probate a paper purporting to be the last will and testament of a certain John Cramer. The appellant was the brother of the deceased and his heir at law.

The probat of the will was objected to on several grounds: 1st. Want of capacity on the part of the testator to make a will. 2nd. Undue influence exerted over him by Margaret Smeltz, one of the devisees. 3rd. Failure of the party to *request*, at *the time* of their so doing, the witnesses to attest it as his will. 4th. That he did not, *at the time* of his signing it, *publish* and *declare* it to be his last will and testament. 5th. That there is no evidence he had any knowledge of its contents at the time he affixed his signature.

There is not a particle of evidence furnished by the record of any influence being exercised over the testator by Mrs Smeltz, nor is there any adduced to show he was not of a

sound, disposing mind; but, on the contrary, the evidence of all the witnesses is positive and direct to the point, that he had sufficient capacity; in other words, was of sound mind, capable of making a valid deed or contract. If, therefore, there be any objection to the paper, as a testamentary disposition of property, it must be found in the circumstances attending its preparation, signing and attestation.

It appears from the evidence that the will was written by the executor named in it, whose son and self were the principal objects of the testator's favor and bounty. These circumstances, in the absence of other proof, would very properly suggest suspicion as to fairness, in a case where the property is given to those who are not allied by the ties of blood to the testator; but as the law concedes to a man of sound mind, the right to dispose of his property in any manner he may deem proper consistent with its policy, either by gift to take effect *in presenti*, or after his death, it is no valid objection to a will that the testator has given his property to strangers to his blood, provided he had the required mental capacity and was free from undue influence. Experience not unfrequently informs those, who have encountered the trials and vicissitudes of a long life, that kindness is to be received not only at the hands of those who are our kindred in blood, and that such, by their conduct, may forfeit all claim upon their bounty. The observation of every sensible man must notify him, that a person may have very satisfactory, and, to himself and the world, justifiable reasons for disinheriting his kindred, but which he would be unwilling to make matter of record. From a becoming and praiseworthy respect to the feelings of the living, a testator is properly dispensed from the necessity of assigning the motives which govern him in the selection of the objects of his bounty. We mention the fact not because we wish to be understood as intimating, in the slightest degree, there is anything in the case before us showing that the appellant failed in any manner faithfully to respond to the obligations imposed by brotherhood,—for on the subject of his conduct to the deceased the record speaketh not—but to

announce the principle that the law contemplates as a possible case, that kindred may, by their own actions, cease to have a hold on the affections or bounty of a relation. "It is not," say the court, in *Davis vs. Calvert,* 5 *Gill and Johns.,* 300, "of itself sufficient to avoid a will or testament, that its dispositions are imprudent, and not to be accounted for." In the case now before us, we have no information in regard to the character of the previous intercourse between the testator and his brother, the appellant. And although "a will or testament may, by its provisions, furnish intrinsic evidence, involving it in suspicion, and *tending* to show the *incapacity* of the testator to make a disposition of his estate, with *judgment* and *understanding,* in reference to the amount and situation of his property, and the relative claims of the different persons who should have been the objects of his bounty—such as a disposition of his whole estate, to the exclusion of near and dear relations, having the strongest natural claims upon his affection: a wife and children for instance, or other near relations, without any apparent or known cause, which alone would be a suspicious circumstance," yet, it would not "furnish, *per se,* sufficient ground for setting aside the instrument." 5 *Gill and Johnson,* 300.

The substance of the testimony in regard to the preparation, execution and attestation of the will is this: The testator was in good health, and, prior to the day on which the paper was signed, had requested two of the witnesses to meet him at his house for the purpose of witnessing his will, specifying the day on which he desired them to call on him. One of the attesting witnesses, (Mr. Smith,) says, he went to Mr. Cramer's house about eleven o'clock on the day the paper was executed; that when he got there, Mr. Crumbaugh was in an adjoining room writing; Mr. Cramer was in the room witness entered. Witness remained an hour; Mr. Cramer went into the room once or twice in which Mr. Crumbaugh was writing. Witness went to his dinner and returned in about an hour, and was joined by the other witnesses. After they had been at the house some time, the appellee came into

the room where they were, with the paper in his hand; "he laid the paper on the table, and said in the presence of Cramer and the witnesses, gentlemen, the will is now ready to be signed, or to be executed; Mr. Cramer, you will have to sign it first; Mr. Cramer took the pen and signed it; Mr. Crumbaugh then pushed or turned the paper to Mr. Potts, who was sitting at the same table, for him to sign it. Mr. Potts did so, then I signed, and then Mr. Hedges; during this time nothing was said by any body." * * * * "When Mr. Crumbaugh was in the act of folding up the will, I was about to leave the house, when Mr. Crumbaugh said, stop, I want you to witness the sealing up this will, perhaps, when it is broken open, I will want to call on some of you gentlemen." * * * * "After the will was sealed up, Mr. Potts, or some one present, said, who will take charge of, or keep the will, to which Mr. Crumbaugh replied, I will keep the will, if you have no objection, Mr. Cramer, to which Mr. Cramer said, yes." Mr. Potts testifies, that Mr. Crumbaugh asked the question, "whether it was his, (Cramer's) last will and testament?" and that Mr. Cramer "assented to or nodded his head."

With but one exception, so far as the preparation, execution and attestation of the paper now under consideration are involved, this case is very like that of the will of Thomas Mason, the circumstances attending which are reported in the case of *Mason vs. Harrison and Boggs,* 5 *Har. and Johnson,* 480. The testator in that case dictated to an amanuensis the principal matters in the will, and affixed his mark to it, with the assistance of one of the persons present, saying nothing, however, at the time in regard to his intention. Subsequently, after the witnesses had affixed their names, and the testator had been removed to another room, in reply to the question, "Is this your will?" he replied yes. This was held a sufficient compliance with law and the will sustained, although it was clear from all the evidence the testator was in a very helpless condition, incapable of seeing or writing.

It is true, that in that case the material parts of the will

were read over to the testator in the *presence of the witnesses* before the execution, and it is this circumstance which principally distinguishes it from the case now before us. The inquiry then is, is the reading of the will in the presence of the attesting witnesses essential to the validity of its execution? We did not consider the argument of the counsel for the appellant as going thus far, but merely as insisting it should *affirmatively* appear, that he either read himself or had read to him the will before he affixed his signature. To this extent, however, we cannot go. Here we have the amplest proof of execution. The testator but fulfilled an intention for some time entertained and expressed. He notified the witnesses to attend at his house and explained to them his purpose, and also designated the person whom he designed should prepare his will. The evidence shows he had sufficient time to inform himself of the contents of the paper which he did sign, and that he was alone with the party who prepared it sufficiently long to have dictated and discussed its whole contents. The proof is all one way as to his mental capacity. It is not pretended he labored under any feebleness of mind not common to him, and the witnesses describe him as a man of strong common sense, of resolute will, and not easily to be shaken from his purposes. Where the capacity of the party is wholly unimpeached and an absence of proof of fraud, the law presumes a knowledge on the part of the testator of the contents of the paper which he executes. This is the rule laid down by Sir John Nicholl, in *Billinghurst vs. Vickers,* 1 *Phillimore,* 187, (1 *Eng. Eccl. Rep.,* 69,) and that was a case in which the executor, who was also a legatee under the will, prepared that part of the will in which he was designated as executor and legatee. There was no direct proof that the will was read to him, nor that he read it himself. As observed by Sir John Nicholl, in *Fawcett vs. Jones,* 3 *Phillimore,* 434, (1 *Eng. Eccl. Rep.,* 452,) "it is a general leading principle, that when an instrument has been executed by a competent person, you must presume that the person so executing it knew its contents, and the effect of the instru-

ment, and that he intended to give that effect to it." But it is supposed the case of *Bullin vs. Barry*, 1 *Curteis*, 614, (6 *Eng. Eccl. Rep.*, 406,) establishes the proposition of law, that *in all cases* where the party who prepares the draft of the will takes an interest under it, it is incumbent upon him to show *affirmatively*, not only the capacity of the testator, but the fact that he was made acquainted with the contents of the paper, either by having read it himself or from having had it read to him. There is certainly language used in that case which furnishes some warrant for such a construction, but this circumstance was noted and commented on when the case came on to be heard before the judicial committee of the Privy Council, to which it had been carried by appeal. Mr. Baron Parke, in delivering the opinion, 1 *Curteis*, 637, (6 *Eng. Eccl. Rep.*, 417) observes, that the rules which govern cases of this nature are two:—first, the *onus probandi* lies in every case upon the party propounding a will, and he must satisfy the conscience of the court that the instrument so propounded, is the last will of a free and capable testator. The second, that if a party writes a will, under which he takes a benefit, that is a circumstance which generally ought to excite the suspicion of the court, and calls upon it to be vigilant and jealous in examining the evidence in support of the instrument, in favor of which it ought not to pronounce unless the suspicion is removed, and it is judicially satisfied that the paper propounded does express the true will of the deceased. In adverting to the doctrine as laid down by Sir John Nicholl, it is said, his language is "somewhat equivocal and capable of leading into error." In regard to the observation, that where the party benefitted prepares the will, the presumption and *onus probandi* is against the instrument, and the proof must go not merely to the act of signing, but to the knowledge of the contents of the paper, and where the capacity is doubtful there must be proof of instructions, *or reading over*, it is remarked, "if, by these expressions, the learned judge," (Sir John Nicholl,) "meant merely to say, that there are cases of wills prepared by a legatee so pregnant with suspicion, that

they ought to be pronounced against in the absence of evidence in support of them, and that extending to clear proof of the actual knowledge of the contents by the supposed testator; and that instructions proceeding from him, or the reading over the instrument by or to him, are the most satisfactory evidence of such knowledge, we fully concur in the propositions so understood, in all probability the learned judge intended no more than this.   But if the words are to be construed *strictly;* if it is intended to be stated as a rule of law, that in every case in which the party preparing the will derives a benefit under it, the *onus probandi* is shifted, that not only a certain measure, *but a particular species of proof is therefore required from the party propounding the will,* we feel bound to say we conceive the doctrine incorrect."

Again, "the strict meaning of the term *onus probandi* is this, that if *no* evidence is given by the party on whom the burden is cast, the issue must be found against him.   In all cases this *onus* is imposed on the party propounding a will; it is *in general discharged by proof of capacity and the fact of execution,* from which the knowledge of and assent to the contents of the instrument are assumed, and it cannot be that the simple fact of the party who prepared the will, being himself a legatee, is, in every case and under all circumstances, to create a contrary presumption, and to call upon the court to pronounce against the will, unless additional evidence is produced to prove the knowledge of its contents by the deceased."

There is nothing in all this which affects the measure of proof adduced in this case.   We have no proof of the relations of friendship subsisting between the testator and his legatees, nor of those between him and the appellant.   All the information we have is, that he was in his usual health, of sound mind, fulfilling an intention which he had previously expressed, that is to say, to have his will prepared by a certain person, and to execute it on a particular day, and at a designated place.   That the will was written in his house is beyond dispute, and that he had the amplest time and oppor-

tunity to dictate, and to examine its provisions after they were put to paper, the facts warrant us in believing; and these circumstances, coupled with the total absence of proof, to show any one had sought to exercise any influence over him, ought, when his capacity is *fully established,* to be conclusive of the validity of the paper as a testamentary disposition of his property.

We see nothing in the requirements of law or the facts of the case, to induce us to come to a conclusion different from that of the orphans court, and therefore affirm their decision.

*Order affirmed, with costs.*