Argued 17 November ; decided 22 December, 1902.

## HOLMAN'S WILL.

[70 Pac. 908.]

WILL—EXTENT OF TESTATOR'S RIGHT OF DISPOSITION.

1. The right of a free and sound minded testator to dispose of his property is unlimited, and his wishes, as expressed by will, should be respected, without reference to his recognition or disregard of natural claims upon his bounty, or the judiciousness of his gifts.

BURDEN IN PROBATING WILL—UNDUE INFLUENCE.

2. Though evidence that a will was duly executed establishes a *prima facie* case entitling the court to probate it, the proponent, in case of a contest on the ground of fraud, undue influence, etc., still has the burden of proving that it was the free and voluntary act of the testator, and contains his unrestrained wishes as to the disposition of his property.

WILL—SUFFICIENCY OF UNDUE INFLUENCE.

3. The fraud, undue influence or force sufficient to cause a will to be set aside, must be such as overcame the free volition of the testator, and caused another's purpose to be enforced through the will, and must have been the efficient cause, without which the instrument would not have been made as it appears.   Such fraud, force or undue influence may be either physical or mental.

UNNATURAL DISPOSITION AND CONFIDENTIAL RELATIONSHIP.

4. The mere fact that a will makes what is termed an unnatural disposition of the testator's property does not create a presumption that it was procured by undue influence ; nor does this fact in connection with a confidential relaitonship between the testator and the object of his bounty create such a presumption : but where these conditions coexist, slight evidence that the beneficiary abused .the confidence reposed in him will invalidate the will.

WILL—EVIDENCE OF UNDUE INFLUENCE.

5. Evidence examined, and a finding that the execution of decedent's will was induced by undue influence, is held not to be justified.

From Multnomah : ALFRED F. SEARS, JR., ARTHUR L. FRAZER and MELVIN C. GEORGE, Judges, in joint session.

---

NOTE.—As to the Effect of Unequal or Unjust Distribution of Testator's Property on a Will, see *Maddox* v. *Maddox,* 35 Am. St. Rep. 33 ; *Knox* v. *Knox,* 36 Am. St. Rep. 235 ; *Burney* v. *Torrey,* 46 Am. St. Rep. 33 ; *Berberet* v. *Berberet,* 52 Am. St. Rep. 634, note ; *In re Kaufman,* 59 Am. St. Rep. 179 ; note to *Kerr* v. *Lunsford,* 2 L. R. A. at p. 671 ; *Middleditch* v. *Williams,* 4 L. R. A., 738.

On the Nature and Degree of Undue Influence Necessary to Invalidate a Will, see *In re Hess's Will,* 31 Am. St. Rep. 665, 670, and monograph ; *Knox* v. *Knox,* 36 Am. St. Rep. 235 ; *Fry* v. *Jones,* 44 Am. St. Rep. 206 ; *In re Kaufman,* 59 Am. St. Rep. 179 ; *Englert* v. *Englert,* 82 Am. St. Rep. 808 ; *In re Shell's Estate,* 89 Am. St. Rep. 181.

As to the Presumption of Undue Influence Arising From the Relationship of the Testator and the Beneficiary, see *Richmond's Appeal,* 21 Am. St. Rep. 94, and note ; *Schierbaum* v. *Schemme,* 80 Am. St. Rep. 604 ; *In re Shell's Estate,* 89 Am. St. Rep. 181.—REPORTER.

This is a proceeding by Roy Holman, acting through his guardian *ad litem*, to revoke the probate of the will of his father, John W. Holman, deceased. The probate was sustained by William M. Cake, County Judge, but set aside on appeal to the circuit court, where the judgment was rendered by Judges Sears and Frazer, Judge George dissenting.        REVERSED.

John W. Holman died February 18, 1902, leaving a last will and testament, whereby he devised to his wife, Lucetta, and his children, Roy and Ruth, certain realty in section 26, township 2 north, range 1 west, and another parcel situate on Sauvie's Island, in Multnomah County, and to his children Anna Sophia and John Wheeler his home on Everett Street, in Portland, Oregon, and bequeathed to his nephew George Holman, son of his brother Robert, all of his jewelry and $250 in money, to be paid by Warren J. and Charles Holman, being in part consideration for bequests made to them; to Beulah Holman, wife of Charles Holman, his piano; and to Lucetta his household furniture,—and by another provision confirmed a certain trust deed to an undivided half of lots 5 and 6, block 56, Couch's Addition to Portland, theretofore executed and delivered to his nephew Charles Holman as trustee for his son Warren J., and directed that at the death of Charles such property should vest in Warren J., if he be then living, and, if dead, in his heirs, but empowered Charles, if deemed advisable by him, to convey at once, or at any time thereafter, the property to Warren J., his heirs or assigns, and by the fifth item ratified and confirmed a bill of sale, made and executed of even date with the will, to Warren J. and Charles, of all his interest in the business of Holman & Co., being a truck, dray, and forwarding business in the City of Portland. The will was admitted to probate in common form by the county court of Multnomah County February 21st, and on December 3, 1900, Roy Holman, by Edward Holman, his guardian *ad litem*, instituted this proceeding by petition to revoke such probate, and to set aside and annul the will. By the petition, it is shown that the realty situated in section 26 was appraised at $500; that on Sauvie's Island, $1,000; the home on Everett Street, $5,000; and the

whole estate, both real and personal, at $7,425.75; but it is alleged that the realty devised to the widow and her children Roy and Ruth does not in fact exceed $200 in value. It is further alleged that the pretended will was not the result of the free act and deed of the testator, but that he was influenced, induced, and compelled to execute and sign the same by fraudulent contrivances and undue influence of Anna Sophia, Charles Holman, and Sarah Norton, and especially that of the two former; that for some time prior to and at the time of the execution of the pretended will the testator was weak in mind and body, and without individual and efficient will, and was under the influence of the parties named, who, in order to influence and coerce him to sign said pretended will, conspired, confederated, and connived together, and falsely and fraudulently created in his mind, by acts, innuendoes and influences, a prejudice against his wife and his children Roy and Ruth, and thereby influenced him, in his then feeble condition of mind, to execute said pretended will. This is the gravamen of the petition. Other allegations follow, but they are merely in elaboration of the manner in which the signing and execution was procured by the persons complained of. After a hearing, the county court reprobated the will, but upon appeal to the circuit court it was set aside, and from that decree proponents appeal to this court.                    REVERSED.

For appellants there was a brief over the name of *Carey & Mays,* with an oral argument by *Mr. Charles H. Carey.*

For respondent there was a brief over the names of *Williams, Wood & Linthicum,* and *William A. Cleland,* with an oral argument by *Mr. Charles E. S. Wood* and *Mr. Cleland.*

MR. JUSTICE WOLVERTON, after stating the facts, delivered the opinion of the court.

The evidence adduced is voluminous, and it is impossible to discuss it in detail, or even to cover its entire scope in synopsis without unduly prolonging the opinion. We will therefore recall merely such material facts as are deemed to have been

proven, and discuss such testimony only as seems to be in discord or doubt, relative to pertinent facts involved in the controversy.

John W. Holman and Lucetta Holman were married in July, 1882; Holman at the time being a widower, having four children then living,—Warren J., aged eight years; Anna Sophia, sometimes referred to as "Tennie," seven; Henry J., since dead, five; and John Wheeler, three. The offspring of the marriage are Roy and Ruth, aged thirteen and eight, respectively, at the time of the trial of this cause. About the time Roy was born, or before, there grew up an estrangement between Holman and his wife, superinduced by the inability of her and his children to live in harmony. Being asked if she separated from her husband, she testifies that Tennie made things so unpleasant for her that she could not stay in the house; that she went away for a few days, and her husband begged and persuaded her to come back; that Mary Holman and Ella Holman came to her and told her that, if she would return, he would not let Tennie interfere any more; that she went back, and things were worse than ever; and that she went away again for three weeks. This occurred in about 1893, the exact date not appearing. The estrangement thus engendered was such that he contemplated divorce proceedings against her, and their relations continued more or less strained up to the time of his death. They lived together thereafter, but with more or less ill feeling and disagreement relative to the older children, the management of the household affairs, and the expenditures for their living, until on the 8th of October, 1899, he departed for California without her knowledge. On August 4, 1893, he deeded to Charles the undivided half of lots 5 and 6 in block 56, Couch's Addition, in trust for Warren J., and for his use and benefit; his wife not joining in the conveyance. This is the deed which the will confirms. On the day preceding he deeded the home property to Anna Sophia, and on September 6th following it was reconveyed to him by quitclaim; but the execution of these deeds was never disclosed by him to his wife. It must be conceded that Holman was, until stricken with the dis-

ease from which he died, a person of robust physique, of strong intellect, self-reliant, and somewhat opinionated. There is some evidence that he was susceptible to influence by a play upon his sympathies, especially after he became sick and enfeebled by disease, and it may be that he was in a manner subject to such dominance. He was always devoted to the two younger children, manifestly being as much attached to them as to the older ones; and, ordinarily speaking, there was no reason why he should show any partiality between them. Among the older children, Warren J. was perhaps his favorite, or at least he seems to have accorded to him more advantages than to the others. Charles Holman is a nephew, the son of a brother now deceased and Mary Holman, with whom he has long enjoyed a familiar acquaintance and association, not in business relations particularly, but in social affiliations. Prior to April 1, 1899, when Charles was appointed deputy internal revenue collector, he, with his family, lived in Clackamas County. After that time his duties called him to Portland more frequently, and on September 15th his family moved thereto. While in Clackamas County the testator visited them once or twice during the summer, sometimes taking a friend and spending a week hunting upon and about the place. As related by Charles, "he came when it was convenient for him and when he wanted an outing." After that date he saw the testator more frequently. In their conversations, both at the farm and in Portland, the testator frequently conversed with Charles relative to his family differences and affairs, and sometimes touching his business interests and relations. So that, without doubt, Charles knew of these matters. It does not appear, however, that the testator sought his advice in general, or even respecting any particular subject or transaction. They were close friends, but, if there was any dominance in mentality, it is not apparent from the record. Charles testifies that on the day prior to the execution of the will he met the testator at the Dekum Building in the afternoon, who said he was looking for him; that he had made up his mind to go to California, and wanted witness to "look after his affairs while he was gone, and supervise his ex-

penditures;" that they discussed the matter together, the testator, among other things, saying that he wanted to keep his expenses down as closely as possible; that he drew nearly his whole allowance from his business, and that his expenses had been heavy; that he wanted to arrange matters in such a shape that he would be protected in his absence from bills that might be run by those for whom he was responsible; that witness told him it was not a very agreeable undertaking, and advised him to give his wife a definite allowance, to which he responded, "That would not do," and, in effect, that she would pocket the allowance, and incur liabilities notwithstanding; that he proposed putting an advertisement in the *Oregonian* and having a paper drawn up for his protection from these bills, and, if witness would look after the matter, he would have them attended to, and witness consented; that he then said, "We will go up and have Judge Northup draw up something that will give you authority to look after those things while I am gone," and, "while I am about it, I believe I will draw my will;" that they went up together, and he conferred with Judge Northup about the best way to protect himself; that he requested him also to draw up his will; that he gave Northup instructions as to the disposition of his property, who made a memorandum thereof, and told him to call the next day, saying that he would then have the papers ready to be executed,—both the authority for the witness to look after his business, and the will; that he and witness had not talked about the bill of sale of the drayage business, but that he and Judge Northup discussed the "ways and means to that end;" that witness did not participate in the conversation between them, except as it related to the preparation of a notice to go into the paper, and the authorization to supervise expenses while the testator was away, and that he did not attempt to make any suggestion about the disposition of his property or effects; that after they left the office they were together perhaps half an hour; that witness agreed to meet him the following day at 2 o'clock to get the power of attorney, and did so meet him shortly after lunch at the Perkins Hotel, and went to Northup's office with him; that they

were together ten or fifteen minutes before going; that the will and other papers were then executed, together with the notice that he would not be responsible for any bills incurred in his absence; that he never saw or knew the contents of the will until after Holman's death; that when they left the office they were together only about six or eight minutes; that he was not in the city when Holman left for California, being up the valley at the time on official business; that when he returned he inserted the notice in the *Oregonian,* and proceeded otherwise to carry out Holman's instructions, by calling at the home of his wife to advise her of the arrangement, but, not finding her, he subsequently sent her a note, which bears date October 15th, wherein he said: "You will find published in the *Oregonian* of to-morrow a notice, 'To Whom It May Concern,' signed by Uncle Jack, by which he makes me his sole agent to contract all bills in his name, and to prevent all other persons from contracting bills in his name. He did this for the safety of all concerned. You know that some of the children might be inclined to run bills, and he had to make the notice general, so as to include everybody. It is not the desire of Uncle Jack to in anywise prevent you from having all that is necessary for your comfortable living, but he especially desired me to see that all expenses are kept as small as possible, as he has some obligations to meet in the near future that will require his funds;" that witness called in person upon different business houses where Mrs. Holman and the family were in the habit of making purchases, and advised them of the conditions; that two or three days later he saw Mrs. Holman, and talked with her personally of what had been done; that she said it was very humiliating to her, and was importunate to know why it was that witness was doing the business, and why she was not intrusted with it.

Warren J. testifies that his father wanted to give him power of attorney to transact and superintend his business and the expenditures of the family while he was away on his contemplated visit to California, but that witness declined to so act for him, and that he then said he would give it to Charlie.

Judge Northup relates that Jack Holman came into his office about the 4th' day of October, 1899, accompanied by Charles, and requested that he draw his will; that he told witness how he wanted it made; that witness took a memorandum of the various items, and requested him to call the next day, when he would have it prepared. Using his own language, he continues: "As stated, Mr. Holman requested that I should prepare his will. I then said, 'Give me the various items,' requesting him to make the beneficiaries of the will and the property that he wanted to give to each. He gave me the names of his wife and 'children, and then commenced to make distribution as set forth in the will, naming each one, and stating what he wanted each one to receive. He then stated that he was in the business of transportation, of some kind, in connection with Mr. Herrman, I think was the name. His desire was that the business should continue without interruption, and he stated that he wanted that property to go to his son Warren Holman, and wanted to know in what manner it could be arranged so that the business would not be interrupted. I then suggested that probably the best way would be for him to make a bill of sale to these two beneficiaries, and have it deposited with some person in whom he had confidence, to be delivered in the event of his death, and to take effect at midnight of the day preceding his death. He expressed himself as satisfied with the arrangement, and I drew the bill of sale accordingly. Then he named Mr. Judge as the person whom he wanted to have possession of this bill of sale. I filled in the name of Mr. Judge, and then suggested that the bill of sale and the directions be given to him. That was the first interview. I then said to him, 'If you will call,' I think, 'to-morrow, in the afternoon, I will have these papers prepared.' * * He had no written memorandum. He relied upon his memory. It seemed to be retentive."

He further testifies that Charles Holman took very little, if any, part in the conversation carried on at the time; that the testator sat near his desk, and that Charles sat back some little distance; that witness recalled but one remark of his, which occurred when the testator proposed giving the piano to Buelah

Holman, the wife of Charles, which was, "No; you don't want to do that, Jack. Should not that go to Tennie?" to which the testator replied: "No, Charles. I want it that way. I may be at your house a good deal yet. Nobody can tell,"—or words to that effect; that on the next day the testator came back, accompanied by Charles, and executed the papers; that witness took him alone into his private office, read the will to him, and asked him if that was what he wanted, to which he replied, "I think that is just right;" that, while it was being executed, Charles came to the door, and perhaps into the room, but otherwise was not immediately present. The bill of sale was also executed, and a letter of instructions signed by the testator to Bundy Judge, who was made the depositary of the bill of sale and the will until the death of the testator. Among others, the letter contained these instructions: "I make this direction because it is my wish and desire that said Warren J. Holman and Charles Holman shall have said business at my death, and I make this bill of sale and this disposal of the same that there may be no interruption in said business, and to save all costs, expense, and trouble." There was a power of attorney drawn at the same time, but it was not satisfactory to the testator, and was therefore destroyed without execution. In the opinion of the witness, who had known the testator for twenty-five years, more or less intimately, he was perfectly competent to dispose of his property by will; and witness, continuing, says that he observed no defect of memory or mental disability during the transaction; that "he was clear in his memory, and knew what he wanted fully;" and that there was no attempt on the part of Charles Holman to influence him in any manner, with the one exception relative to the disposition of the piano.

Mr. Herrman, with whom Holman was associated in business as a partner, under the firm name of J. W. Holman & Co., testifies that Holman was sick, off and on, for several years (that is, he would get sick and go home for a day or so); that one day he went to the doctor, and came back feeling very badly, and that when he disclosed the nature of his sickness they were all very much distressed; that witness induced him to go away to

42 OR.—23

the springs; that it was early in May or June, 1899, when he went; and that he was away on three or four occasions.

Dr. Nichols testifies that Holman consulted with him about his case on May 11th, and he found that he had chronic Bright's disease, but did not know for how long he had been thus afflicted, and from that time on, during the summer until October, he was under his advice; that on the 7th of October testator came into his office and said "he had gotten his affairs all straightened up, and was going away now for the vacation;" that he told witness he had just made a will, and that Charles Holman would take charge of and look after his affairs while away; and that he never intended to go home again to live with his wife; that he had trouble at different times, and had decided that they could not live together; that he was better when he went away than he was two months prior thereto; that at about that time he had an especial attack of stomach trouble, but during September and October he had been feeling very well; and that witness then saw nothing that would indicate he was not in the full possession of his faculties.

Mrs. Mary Holman, the mother of Charles, met the testator while he was in California, and testifies that he told her he was never going back home; that he wanted to make his home with her, and, when she suggested that her house was too small to accommodate him, he asked if she thought he could go to Charles' to live, and requested her to write him, and have preparations made for him when he returned.

It is further shown that Mrs. Lucetta Holman went to Hillsboro about the 15th of September, and returned on the 30th; that when she left she packed up Warren's clothes in a cracker box, and sent them down to the office of Holman & Co., where he was employed, and locked up the house; that Holman was much vexed at his wife for so doing; that Warren went at once to make his home with Mrs. Norton, and that the testator thereafter took his breakfast and lunch with her, sometimes providing his own diet, which was confined to such as was prescribed by his physician. Holman was at home afterwards, however. On the 8th of October he left the house, not saying where he

was going, and thereafter departed for California, his wife knowing nothing of his purposes, but a number of his relatives were at the train to see him off, among whom were his brother Captain Robert Holman, the captain's two sons, his sister Sarah Norton and her husband, Herbert Holman, the brother of Charles, and his wife, Warren J., Anna, and perhaps Mary Holman, the mother of Charles, and others. While absent, about November 14th, Mrs. Holman wrote to him, and, among other things, told him of her illness, which was severe for a time, and from which she had not then recovered. In writing to Charles Holman, the testator inclosed this letter, and upon the back of one of the sheets thereof is found this indorsement in Holman's handwriting: "I wonder now if she thinks about the time she left me for about three weeks up in that house, and not a soul in the house to give me not even a drink. You know the time I slept up at your house, and all the time she was gone out to the Hillsboro ranch." Holman returned from California on New Year's eve, and was met at the train by Warren. From thence they went to the Portland Hotel, where he took a Turkish bath, and from there they went to the home of Charles. On New Year's day he conversed intelligently, told of his trip and various matters in connection therewith, but in the evening sank into a semicomatose state, from which he never fully rallied. Mrs. Holman learned of his return on New Year's day, and went immediately to him, intending to take him home, but, on consulting the physician, found it was not advisable to do so. There is much dispute as to whether it was his desire to go home, and a great deal of ill feeling was engendered between her and the relatives in attendance at his bedside; but it is not necessary to inquire as to who were in the wrong, as it can have no material bearing in the determination of the present controversy.

Now, the strong contention of counsel for petitioner is that, while it is conceded the testator was possessed of sufficient testamentary capacity to make a will, yet he was so weakened and debilitated by sickness and disease, both in mind and body, as to make him a pliable subject in the hands of Charles Holman

and others; and that the will was not the result of his own free act, but of the undue dictation and domination of such persons. It is alleged by the petitioner that Anna Holman and Sarah Norton and the said Charles connived and confederated together, and fraudulently induced and influenced the execution of the will, but the evidence fails to connect Anna and Mrs. Norton with its execution in any manner whatever. Both these persons say under oath that they knew nothing of his making a will until after the testator's death. Anna and Mrs. Lucetta Holman certainly did not get along harmoniously, which state of affairs developed very soon after they were thrown together. Mrs. Norton furnished a home for Warren after Mrs. Holman sent his clothing away, and prepared meals for the testator as he called for them; but these acts bear no suggestion of any conspiracy or any prearranged purpose of prejudicing or influencing the testator against his wife and the younger children. Indeed, we do not understand that it is now urged that these persons were insidiously or designedly instrumental in bringing about the result complained of. This eliminates the idea of a conspiracy, and if there was undue influence exerted, so as to overcome the free will of the testator in the disposition of his property, it must be attributed solely to Charles. Charles' testimony seems to be full and candid, without any attempt at evasion or subterfuge, and he seriously disavows any preconceived purpose to take undue advantage of his uncle. Nor is there much in the record to dispute or gainsay his asseverations, unless it be the sheer fact of his opportunity, and that the disposition of the testator's property appears to be somewhat unnatural and unjust.

1. The right of one's absolute domination over his property is sacred and inviolable, so that he may do what he will with his own, if it is not to the injury of another. He may bestow it whithersoever he will and upon whomsoever he pleases, and this without regard to natural or legitimate claims upon his bounty; and if there exists no defect of donative capacity, whereby his individual will or judgment does not have intelligent and conscious play in the bestowal, or undue influence or

fraud, whereby an unconscionable advantage may be taken of him through the wicked designs of another, the law will give effect to the disposition; and the right to dispose of one's property by will, and bestow it upon whomsoever he likes, is a most valuable incident to ownership, and does not depend upon its judicious use: *In re Kaufman's Estate,* 117 Cal. 288 (49 Pac. 192, 59 Am. St. Rep. 179); *In re McDevitt,* 95 Cal. 17 (30 Pac. 101); *Cramer* v. *Craumbaugh,* 3 Md. 491. And this court has held, in effect, that "while it seems harsh and cruel that a parent should disinherit one of his children and devise his property to others, or cut them all off and devise it to strangers, from some unworthy motive, yet so long as that motive, whether from pride or aversion or spite or prejudice, is not resolvable into mental perversion, no court can interfere": *Potter* v. *Jones,* 20 Or. 239 (25 Pac. 769, 12 L. R. A. 161). To the same purpose is *Hubbard* v. *Hubbard,* 7 Or. 42; *Clark's Heirs* v. *Ellis,* 9 Or. 128; *Chrisman* v. *Chrisman,* 16 Or. 127 (18 Pac. 6); *Darst's Will,* 34 Or. 58 (54 Pac. 947).

2. The burden of proof in the probate of a will rests with the proponent, as it relates to the due and regular execution, the testamentary capacity of the testator, and his voluntary act, free from the domination of fraud, undue influence, or coercion. This is the doctrine announced in *Hubbard* v. *Hubbard,* and, in principle, has been reaffirmed in the Chrisman case. In the latter case the only ground of contest was as to the testamentary capacity of the testator, but it is just as essential to show that the will was not superinduced by fraud, deceit, or undue influence, to make it his act and will, as it is to establish a disposing mentality. It must be "the last will," says Baron PARKE in *Barry* v. *Butlin,* 1 Curt. Eccl. 637, "of a free and capable testator." It is said in *Greenwood* v. *Cline,* 7 Or. 17, that, "where a will is shown to have been duly executed, the law presumes competency in the testator, and that it contains his unrestrained wishes in the disposition of his property." The presumption is a disputable one, however, and may be overcome or refuted by other proofs. It is, notwithstanding, sufficient *prima facie* to establish the will, but it does

not shift the burden of proof. That rests from first to last with the proponent, and, if he would prevail, he must have the stronger case in the end.

3. The fraud, force, or undue influence that will suffice to set aside a will must be such as to overcome the free volition or conscious judgment of the testator, and to substitute the wicked purposes of another instead, and must be the efficient cause, without which the obnoxious disposition would not have been made. This may be accomplished not alone by physical coercion or threats of personal harm or abuse, but also by the insidious operation of a stronger mind upon one weakened and impaired by disease or otherwise, whereby the latter is subjected to the former, and induced to do its bidding, instead of acting in the exercise of unconstrained volition or judgment. It is not all influence brought to bear upon the mind of the testator in the disposition of his property that may be denominated undue or fraudulent, as a friend or relative, or even those in confidential relation, may employ argument, or even persuasion, to induce a bequest, so that notwithstanding it leaves the mind free to act upon its own considerations and judgment.

4. Common understanding suggests that a will should be natural; that is, conformable to the nature and disposition of the person who makes it. Where it does not conform to this idea, it is a circumstance, no doubt, to be considered in connection with other proof bearing upon the question as to whether or not it was the result of undue influence, but, within itself, affords no conclusive or sufficient proof for the purpose, and does not, therefore, raise a presumption that it was so procured: *Salisbury* v. *Aldrich*, 118 Ill. 199 (8 N. E. 777). In the case of gifts *inter vivos*, and contracts made in favor and to the advantage of a person standing in a fiduciary or close confidential relation with the donor, or other contracting parties, such as trustee and *cestui que trust*, guardian and ward, attorney and client, physician and patient, or priest or religious adviser and his parishioner, and the like, the burden of showing that the transaction was fairly conducted, and that no advantage was taken of the relationship, lies with the one having

secured the advantage. The reason, however, for this rule, is that the person receiving the benefit has actively participated in the transaction, as a party thereto, and the explanation required is very naturally within his knowledge and power. Such a reason does not obtain, as it relates to a bequest, as the person to whom it is made may not, in point of fact, have had any part in, or even knowledge of, the act which gives him the advantage; and no presumption arises from the mere relationship of the parties that the donee has abused his position of confidence, and turned it to his own advantage: *Parfitt* v. *Lawless,* 2 Law Rep. P. & D. 462. Some authorities deduce a presumption of undue influence, however, where the two conditions exist together, namely, where the will is one that the testator could not have made, consistent with the claims of duty and affection, and a close confidential relationship between him and the object of his bounty: *Marx* v. *McGlynn,* 88 N. Y. 357. And, see, 2 White & T. Lead. Cas. Eq. 1275. This court, however, in *Greenwood* v. *Cline,* 7 Or. 17, refused to adopt this view, but declared that, where such conditions exist together, slight evidence that the legatee or devisee has abused the confidence reposed in him will suffice to invalidate the will; and we are not now disposed to overturn the doctrine thus established. It simply means that the two conditions combined and existing together will not suffice within themselves to overcome the *prima facie* case made, or presumption arising from proof of the due and regular execution of the instrument, in favor of testamentary capacity and the exercise of an unconstrained volition. Something more will be required to be shown, and slight evidence that advantage has been taken of the confidential relations will suffice to establish the undue influence as against the *prima facie* case or initial presumption.

After all, the difference in practical operation between the two theories is very slight. In order to show that the testator has made an unnatural disposition of his possessions, it requires evidence aside from the will, and so, where it is sought to establish the existence of a close confidential relationship. If undue influence, fraud, or coercion has been practiced, slight evidence

thereof will almost necessarily have been developed in the course of the establishment of these conditions; and as circumstances to be considered in connection with all the evidence in the case for the determination of the question as to whether the testator has been unduly wrought upon, the fact of an unjust disposition and a subsisting confidential relationship will be slight or strong in their evidentiary weight as they are shown to exist in degree. A slight departure from a natural disposition would be of little moment, while one shockingly unjust would have much greater weight; and so with the relationship, it would have force, as it might be shown to be intimate and familiar. So it comes at last, in a case of contest, to a simple determination as to the weight of the testimony when the case is closed. There may arise, and possibly have arisen, cases where they were dependent alone upon the naked presumption of the exercise of a sane mind, and the operation of a free and unconstrained will, from a due execution, counterbalanced by a presumption of an undue influence, arising by the conjoined existence of the two conditions discussed. As to such the rule becomes most important, as the establishment or invalidity of the will would depend entirely upon the two presumptions. But in the great generality of cases, if not in all, it can have no practical effect, as the testimony adduced leaves no room for operation of the latter presumption, and affords the more satisfactory *criteria* for determining the controversy. Such is clearly the nature of the case before us.

5. The testator and Charles were close friends, and were much in each other's company after Charles' duties called him to Portland in April preceding the execution of the will. And it may be that Charles was his closest friend, but no business relationship existed between them, or transactions of a business nature were had, prior to the execution of the will, except the one instance when the trust deed was made in 1893. A deed was made to Anna about the same time covering the home property, of which she was not advised until requested to reconvey. No one has suggested that the testator's mind was in a weakened condition or subject to the insidious influence of another at

this time.  He was robust and healthful, both in mind and body; and, if he could have been induced to depart from the dictations of his own volition or judgment, it must have been by sheer force of a superior mind or through some fraudulent practice.  Charles was then living in Clackamas County, and was not frequently thrown in company with the testator, and from the testimony there cannot be adduced even a remote suspicion that Charles so influenced him to make the conveyance alluded to.  During the last year of the testator's life, and perhaps longer, he was afflicted with a fatal disease, and it seems that prior to making his will his mind was somewhat affected, —attributable, no doubt, to the disease with which he was stricken.  An instance is related, which occurred probably in September, of his coming home sick, and directing his physician to be called, when it developed a little later that he could scarcely talk,—mumbling his words in an unintelligible manner, but the attack lasted for the night only.  The next day he was about town, and could talk as readily as before.  This was referred to by Mrs. Holman, and perhaps another witness, as a paralytic attack; but, in view of his rapid recovery, it could not have been of that nature.  It is also related of him that he was given to weeping at times, without any apparent or sufficient cause.  Two or three instances are shown.  These circumstances may have been, and no doubt were, manifestations of a mind weakened and impaired, but it did not incapacitate him from the transaction of business.  For the purpose of this case, it may be conceded that he might have been more easily wrought on by the insidious machinations of another, and constrained to do that which his better judgment would have condemned.  The question then is, was any advantage taken of his condition, and his free and conscious judgment overcome in the disposition made of his property?

One can scarcely follow the testimony of Judge Northup touching the preparation of the will and other documents without being impressed that the testator not only knew and intelligently comprehended fully and completely what he was doing, but that he acted entirely upon his individual judgment.

He stated without prompting or memorandum the details of his intended disposition, and was importunate that his own ideas should be carried into effect. There is the circumstance that Charles attended him on the day he directed his will to be drawn, and also upon the next day, when it was executed; but he took no part in directing what should be done, except to make a single suggestion, which was not heeded. Charles relates how he came to be with his uncle on this occasion, and with apparent candor and truthfulness details the different conversations had with him leading up to the transaction; and there is certainly nothing in the testimony of other witnesses to convict him of fraud or using undue influence. He was not without the opportunity, perhaps, to gain an advantage, but this is not sufficient within itself. It must be further established that the advantage came through his fraud or insidious domination. Aside from the transfer of an interest in the truck and transfer business of Holman & Co. to Charles, who had no claim upon his bounty, the final disposition of the testator's property was not altogether inequitable. His reason for making the bill of sale was that he desired the business in which he was then engaged should be continued without interruption or the necessity for administration,—supposing, no doubt, that Charles and Warren would take his place in the copartnership with Herrman, and desiring that Warren should be installed in business,—and this was not without relevancy. That he was mistaken as to the outcome, or probably had not counted upon the condition that Herrman would not assent to the new relationship, is a fault in the full survey of the situation, yet his clear purpose was manifest, and accounts for the disposition. Warren received more than the other children. He had been favored before, and it is what might have been expected. The two younger children received less than the others. The reason assigned for this by the testator was that their mother, who was possessed of property of considerable value, was as much bound by parental ties to provide for them as himself, and he believed that, if they received her property in the end, they would be as well provided for as his older chil-

dren under his will. Upon the whole, the dispositions made, while not altogether equitable and just, when the ties of kindred, duty, and affection are considered, cannot be said to be unnatural, taking into account the testator's predilections and disposition. The will shows a thoughtful consideration of the existing conditions, and a full adjustment of his property interests from his peculiar standpoint.

His wife received a bequest in lieu of her dower, and as to this she had her election whether to take, or to retain her dower interest in his realty instead. But as to her it is very apparent what induced the particular provision. The idea first took root in 1893, which induced him to contemplate divorce proceedings against her on account of her conduct toward him, and when there could not have been a conjecture of any undue influence on the part of Charles or any one else. Two deeds were then made, disposing of the greater portion of his realty, and one was never recalled, but ratified by the will. Before going to California, Holman had again made up his mind to separate from his wife, induced, no doubt, by her treatment of him,— among other things, in turning his son away from home, locking the house against himself, and leaving no provisions for his convenience and comfort. This is shown by the testimony, not only of Charles, but Dr. Nichols, who talked with him on the day before he left; by that of Mrs. Mary Holman, who met him in California; and by his letters while away. It does not appear that there was any prearrangement or understanding had with Charles to make his future home with him on his return, although it may be inferred that he probably contemplated such a thing; but, from Mary Holman's testimony, it would seem that the matter had not been fully settled in his mind until shortly prior to his return. Possibly there might have been such an arrangement prior to his going away, but one thing is certain above all others: Whatever arrangement was made in the end, it was induced by the action of his wife, and not by Charles Holman. He did not then intend to return to his home, or to live with his wife again, and the aversion which she induced in his mind had more to do with the particu-

lar disposition of his property than all other influences put together. This is not saying that she was entirely in the wrong. Both were perverse, and he may have been as obstinate and exasperating as she. But their disagreement gave rise to his aversion of her, and became a controlling factor in his mind when he came to make his will. It does not account for the bequest to Charles Holman, yet it may have had something to do with it. Charles and his wife had been kind to him while things were not altogether agreeable at home. There is another circumstance that may have had much to do in influencing this particular bequest. Holman was unable to control his expenses as best suited his ideas of economy, and having concluded to go away, and being desirous of keeping them within the bounds of his income, first requested Warren to take charge of his affairs, and look after and superintend the incurring of bills against him by those for whom he was responsible, but he declined to become his agent in that regard; and then he applied to Charles, who was willing to undertake the responsibility, and did afterward execute his behests in relation thereto. Holman's acts, carrying into execution this idea, showed a determination and fixedness of purpose that cannot be attributed to any outside, dominating influence, and was a conception and execution entirely his own. Nor was he subject to any delusion. His purposes were grounded upon fact, and, while all persons would not have arrived at the same conclusion and done as he did, yet what he did, we are convinced, proceeded from his own free and conscious judgment.

The decree of the circuit court will therefore be reversed, and a decree entered here upholding and giving effect to the will.               .      REVERSED.