Argued 24 October ; decided 7 November, 1898.

IN RE DARST'S WILL.

Hurley v. O'Brien.

[54 Pac. 947.]

1. WILLS—UNDUE INFLUENCE.*—Influence arising from gratitude, or esteem, is not undue, nor can it become such unless it destroys the free agency of the testator at the time the instrument is made, and results in determining the execution in the particular manner adopted.

2. WILLS—WEIGHT OF EVIDENCE—APPEAL.—The conclusion of the county judge who heard the witnesses, and was the neighbor of most of them, upon the issue as to undue influence in procuring the execution of a will is entitled to great weight on appeal, and his decision will be upheld unless the appellate court can say from an examination of the record that the weight of the testimony is the other way.

From Marion :     Henry H. Hewitt, Judge.

---

*NOTE.—As to what is undue influence sufficient to invalidate a will, see extended monographic note to *In re Hess's Will,* 31 Am. St. Rep. pp. 670-691 ; *Eastis* v. *Montgomery,* 36 Am. St. Rep. 228 ; *Knox* v. *Knox,* 36 Am. St. Rep. 235 ; *Cash* v. *Lust,* 64 Am. St. Rep. 583 ; *Kerr* v. *Lunsford,* 2 L. R. A. 668 ; *Davis* v. *Strange's* Executor, 8 L. R. A. 261 ; *Orchardson* v. *Cofield,* 40 L. R. A. 256, 63 Am. St. Rep. 211.

With the case of *Richmond's Appeal,* 21 Am. St. Rep. 94-104, is a long note discussing the question when a presumption of undue influence arises, and the same subject is considered in *Goodbar* v. *Lidikey,* 43 Am. St. Rep. 302 ; *In re Hess's Will,* 31 Am. St. Rep. 681 ; *Henry* v. *Hall,* 54 Am. St. Rep. 22 ; *Maddox* v. *Maddox,* 35 Am. St. Rep. 784. Note in 36 L. R. A. at p. 724.

The closely allied question of who has the burden of proof where the will is claimed to be invalid because of undue influence, is considered in the following cases : *Harrison* v. *Bishop,* 31 Am. St. Rep. 422 ; *In re Hess's Will,* 31 Am. St. Rep. 681 ; *McMaster* v. *Scriven,* 39 Am. St. Rep. 828 ; *Cash* v. *Lust,* 64 Am. St. Rep. 576. Note in 36 L. R. A., pp. 733-740.—REPORTER.

Proceedings to set aside the probate of the will of Catharine E. Darst, deceased. An order of the county court probating the will was affirmed in the circuit court on petition of the proponents Joanna O'Conner O'Brien and others, and contestants James J. Hurley, administrator, and others, appeal.

AFFIRMED.

For appellants there was a brief over the names of *Williams, Wood & Linthicum*, and *Sherman, Condit & Park*, with an oral argument by *Messrs. Geo. H. Williams* and *A. O. Condit*.

For respondents there was a brief and an oral argument by *Messrs. Peter H. D'Arcy* and *Tilmon Ford.*

MR. JUSTICE MOORE delivered the opinion.

This is a proceeding instituted in the County Court of Marion County to have the probate of the will of Catharine E. Darst, deceased, vacated, and the will set aside and declared void. The testatrix died at Independence, Oregon, June 24, 1894, unmarried and without lineal descendants, leaving an estate in Marion County valued at about $26,000, and a will, executed by her five days prior to her death, by the terms of which she bequeathed to the Very Rev. F. X. Blanchet, of Gervais, and to Rev. J. S. White, of Salem, Oregon, the sum of $250 each, for masses to be celebrated by them for the repose of her soul, and that of her deceased husband; to her sister, Eliza O'Conner, she devised her home at Gervais, in said state, consisting of a house and a block of land, which were appraised at $1,000; to her sister, Mary A. Hurley, she bequeathed the sum of $2,500; and to her sister, Joanna O'Brien, she devised and bequeathed the residue of her property; and nominated Rev. J. S. White

and A. N. Bush, also of Salem, as co-executors thereof, without bonds. The county court sustained the validity of the will, and made an order re-probating it, from which the contestants appealed to the circuit court, which affirmed the said orders, and from this latter decree the contestants appealed to this court.

It is contended by counsel for contestants that at the time the testatrix executed the pretended will she was suffering from pain to such an extent as to render her mind feeble and her will power easily overcome, and that Joanna O'Brien, having knowledge of her mental condition, fraudulently induced her to execute a pretended will, different from what she had intended. The testimony shows that the testatrix, at her death, left the following named sisters as her only heirs, to wit: Ellen Pembroke and Anna McDonald, residing at Keokuk, Iowa; Mary A. Hurley and Eliza O'Conner, at Gervais; and Joanna O'Brien, at Independence, Oregon. Her reason for nelecting to make any devise or bequest to her sisters in Iowa, and for the disposition made of her money and property, may be inferred from a brief statement of the relations existing between her and her sisters, and of her feelings towards them. The testimony tends to show that Mrs. O'Brien was always her favorite; that she lived with this sister in Ireland, but, Mrs. O'Brien having immigrated to this country and settled in Iowa, the testatrix removed to that state, and made her home with Joanna until 1867, when she came to Oregon, and two years thereafter married William Darst, and settled in Marion County; whereupon Mrs. O'Brien, at her request, left Iowa, came to this state, and settled near her. In 1883 her sister Eliza came to this state, and lived with and worked for Mrs. Darst eleven years, aiding her in housekeeping, for which service Eliza says her sister promised to give her two shares of her estate,

and other witnesses testify that Mrs. Darst had said to them that she intended to provide well for Eliza O'Conner. After Mr. Darst's death, Miss O'Conner became ill, and in the fall of 1894 Mrs. Darst furnished her the means for travel and treatment; whereupon she went to Iowa, entered a hospital, and submitted to a surgical operation for her ailment, and returned a few days before her sister died. Mrs. Darst, after Eliza's departure, seemed to blame her for leaving, claiming that in consequence thereof she was obliged to break up housekeeping. Mrs. Darst, in the fall of 1894, became afflicted with inflammatory rheumatism, and went to live with her sister Mrs. Hurley, remaining with her until February 15, 1895, when Mrs. O'Brien, at her request, took her to St. Vincent's Hospital at Portland, Oregon, where she remained until May 31 of that year, when Mrs. O'Brien, at her request, took her to her home, where she died. Mrs. Darst had loaned the sum of $2,500 to her nephew James Hurley, who failed to pay the interest due thereon in the fall of 1894; whereupon her bankers, at her request, demanded payment of the amount so due, in consequence of which considerable ill feeling was enkindled between the testatrix and Mrs. Hurley and the members of her family; and Mrs. Darst, being asked, after she went to Mrs. O'Brien's, if Mrs. Hurley should be invited to see them, replied: "I beg of you, for God's sake, to keep them away. I don't want to see one of them." Mary Hurley, a niece of the testatrix, however, went to wait upon her aunt; whereupon the latter said: "She is trying to do all she can for me now, but it won't do her any good. When I was on her floor, she would not give me a drink of water." Mary Hurley, in referring to this remark, says: "I can say that it is not true. When she was at our house she received the best of care. She asked for a drink one day, and my sister went to get

it, and it was not taken in right away, but I took it in afterwards." Mrs. Hurley, in answer to the question whether she had any quarrel with Mrs. Darst, said : "I had no quarrel with her. She said she had given me something, and I said : 'No, your didn't ; you gave that to Mrs. O'Brien. Mrs. O'Brien got it.' "

This epitome of the testimony will serve to show the state of Mrs. Darst's mind when, on June 19, 1895, Rev. J. S. White, at her request, after he had excluded all persons from and closed the doors of her room, wrote her will as she dictated. She had a reason for the disposition of her property, as is manifest from the testimony of Rev. J. S. White. He says that she expressed a desire to bequeath to him $500 for masses, but he told her she ought to leave to her pastor at Gervais one-half of that, to which she assented, and it was so expressed in the will. That Mrs. Darst said to him, in response to his inquiry if she did not intend to leave Eliza O'Connor any money : "If I leave her any money, she would travel; would go to Ireland, and spend it all in traveling. I want to give her some property that will hold her down, and out of which she will derive an income to help her along." That the testatrix, speaking of the bequest to Mrs. Hurley, said : " This is the amount of the note which they owe me ; that will cover this note." That, knowing the Sisters of St. Vincent's Hospital expected some donation from the testatrix, he asked her if she wished to make any bequest to them, to which she replied, "No ; they got already all that I am going to give them ;" and, in answer to his inquiry if she intended to leave any sum to the Sisters of the Precious Blood of Mt. Tabor, she said, "I gave them $1,000 in cash, and that is all I am going to give them." In speaking of her reason for not making any provision for her sisters in Iowa, the testatrix said : " I have not seen them, nor heard

from them, for so long that they have passed out of my existence." She also told Rev. J. S. White that her reason for making such a donation to Mrs. O'Brien was that she had been good to her, and she wanted to reward her for her kindness. Mary Hurley, in speaking of Mrs. O'Brien's method of influencing Mrs. Darst against her relatives, says: "At one time I came into the room to see Mrs. Darst, and Mrs. O'Brien was upon the bedside whispering, and just as I came in she was speaking of myself. She said to Mrs. Darst that I came there for my health. That I was in poor health, and it seemed to be an incumbrance to her, but she would keep me for what benefit it would do me. This was the first I remember of the whispering. When I came in she stopped, and then she spoke my name over, and said, 'I would do what I could for her,' when I was in the room. After that I saw her from a distance, whispering. What the conversation was I did not hear. The next time was the eighteenth of June. As I was coming into the room she mentioned mother's name, and she was stooping over the bed and whispering to her. Mrs. Darst was hard of hearing at this time, somewhat. She says, 'Now, you give her that much,' and then mentioned mother's name, 'and for him, you make him come out with the last cent he has beat you.' Those were the words she said when I was coming into the room, and as I came in she mentioned Jimmie's name (my brother's name) in a low tone. I understood the name distinctly both times, and knew what she was talking about, and then she smoothed it over, and says, 'Poor Jimmie, don't be hard on him.' Before that she had told her to make him come out with the last cent."

Miss O'Conner says that Mrs. O'Brien, in speaking of the probabilities of Mrs. Darst making a will, said, "Never you mind, I will see that she makes her will."

Mrs. O'Brien denies these statements, and there is a decided conflict in the testimony as to the part claimed to have been taken by her in procuring the execution of the will.    Miss O'Conner also says that a few days prior to her sister's death she said to witness:  "You have been a cruel sister to me to write that letter to me from Keokuk, telling me you were coming out to see me one day, and going back the next day."    This witness says that no such letter was written, but admits that when this statement was made she thought Mrs. Darst "might not be very steady in her head, from sickness."    Dr. MacKenzie, one of the physicians at St. Vincent's Hospital, who waited upon and saw Mrs. Darst daily while she was in that institution, says that the rheumatic attack had an exhaustive effect on the patient's nerves, and that in consequence thereof he thought that the state of her mind was such that she could be easily influenced.    Dr. T. J. Lee, of Independence, who was Mrs. Darst's physician from June 5, 1895, to the twentieth of that month, the day after the execution of the will, says that he regarded her mind as sound.    Dr. Walter Babbitt, of Independence, visited Mrs. Darst June 22, 1895, and also on the morning of her death, and says that her mind was clear.    Mr. A. N. Bush, of Salem, Mrs. Darst's banker, expresses the opinion of many other witnesses, when, in speaking of her, he says:  "She was a woman of her own opinions, and I do not think she could have been influenced easily, if at all."    It would be useless to quote more of the testimony, for to do so would not reconcile the conflicts therein.    It was admitted at the argument that Mrs. Darst, at the time the will was executed, had possession and control of her mental faculties.    The fact that she left the bulk of her wealth to Mrs. O'Brien, who possessed a competence without it, and made such an

inadequate provision for Miss O'Conner, who had toiled so faithfully for her, and none at all for her aged and needy sisters in Iowa, seems inconsistent. But, however that may be, the testatrix was the sole owner of her property, and enjoyed the legal right of disposing of it in such manner as best satisfied her wishes, and it only remains to be seen whether the instrument in question is the voluntary act of the testatrix, or the product of her chief beneficiary.

1. Influence arising from gratitude, affection, or esteem is not undue, nor can it become such unless it destroys the free agency of the testator at the time the instrument is executed, and shows that the disposition which he attempted to make of his property therein results from the fraud, imposition, and restraint of the person whose superior will prompts the execution of the testament in the particular manner which the testator adopts : *Gardiner* v. *Gardiner*, 34 N. Y. 155 ; *Dean* v. *Negley*, 41 Pa. St. 312 (80 Am. Dec. 620); *Eckert* v. *Flowry*, 43 Pa. St. 46 ; *Kinne* v. *Johnson*, 60 Barb. 69 ; *Seguine* v. *Seguine*, 42 N. Y. 663 : *Trumbull* v. *Gibbons*, 22 N. J. Law, 117 (51 Am. Dec. 253); *Small* v. *Small*, 4 Me. 220 (16 Am. Dec. 253).

The uncontradicted testimony of several witnesses tends to show that Mrs. Darst always considered Mrs. O'Brien as her favorite sister. This mutual friendship undoubtedly began when the testatrix made her home with Mrs. O'Brien in Ireland, grew when she lived with her in Iowa, was renewed when Mrs. O'Brien, at her request, came to this state, that they might be near each other, and continued unabated until Mrs. Darst died. Their intimate relation might reasonably excite in Mrs. Darst's mind those instincts of affection for, and gratitude to, Mrs. O'Brien which prompted her, as she said, "to reward her for her kindness."

It is argued by counsel for proponents that Mrs. Darst's frugality had resulted in the accumulation of quite an estate, and that Mrs. O'Brien possessed a similar mental quality, the exercise of which had resulted in the same manner, while the other sisters were improvident, and that the testatrix realized that if she bequeathed her money to them it would be squandered. While there is no positive evidence that she made Mrs. O'Brien her chief beneficiary in order that her estate might be preserved, such a conclusion is fairly inferable from a consideration of her careful mode of doing business.

2. Upon the question of Mrs. O'Brien's alleged fraud in poisoning the testatrix's mind against her sisters, and all other acts which would tend to alienate her affection for them, and secure the estate for herself, the testimony is very conflicting; but the county judge, who heard the witnesses, was the neighbor of most of them, and his conclusion thereon is entitled to great weight, and, having found that there was no undue influence exercised by Mrs. O'Brien, we cannot say, from an examination of the record, that the weight of the testimony is the other way, and hence it follows that the decree is affirmed.

AFFIRMED.