ESTATE OF SOPHIA CASEY, DECEASED.

[No. 27,630; decided May 21, 1903.]

**Testamentary Capacity—Undue Influence.**—While the law will not presume the exertion of undue influence from the mere fact of opportunity or a motive for its exercise, nor permit it to be found upon suspicion, yet proof must generally be gathered from the circumstances of the case, for very seldom is a direct act of influence patent, as a person intending to control another's action, especially as to a will, is not apt to proclaim that intent; and among the circumstances from which proof must generally be gathered of undue influence exercised upon a testator are: Whether he had formerly intended a different testamentary disposition; whether he was surrounded by those having an object to accomplish to the exclusion of others; whether he was of such weak mind as to be subject to influence; whether the alleged will is such a one as would probably be urged upon him by those surrounding him; whether the persons who surrounded him were benefited by the alleged will to the exclusion of formerly intended beneficiaries.

**Acknowledgment of Will—Failure of Memory of Witnesses.**—The failure of the attesting witnesses to the will involved in the present case, they being the nurse and physician attending the alleged testatrix at the time of the execution of the instrument, to recollect whether she acknowledged the paper as her will, is adversely commented on by the court, especially in view of the fact that the instrument purports to have been executed at a recent date and in the presence of impending death.

**Testamentary Capacity—Clinical Chart of Nurse as Evidence.**—A clinical chart kept by a nurse, showing, by entry made therein by her, that she administered a powerful opiate to her patient a short time before the patient is alleged to have executed a will, is, in conjunction with the testimony of the nurse as what must have been the stupefying effect of the drug, strong evidence of the condition of the mind of the testatrix at the time of the alleged testamentary act.

**Testamentary Capacity—Person in Last Sickness.**—The testatrix in this case having executed a will on the last day of her life, at the age of nearly eighty years, the court finds, from the combined effect of her sickness, the frequent administration of opiates, the intensity of her pains, and the other influences acting upon her will and understanding that she must have been incapable of voluntary and intelligent disposition at the time.

**Testamentary Capacity—Undue Influence.**—The court finds from an examination of the evidence in this case that the will dated October 21st was inspired by the proponent, that he was the informing

spirit of that testament, and that it was his will rather than of the nominal testatrix.

Application for probate of wills filed October 21, 1902; September 25, 1902; October 21, 1901. Contests as to each were consolidated at the trial.

C. M. Jennings, for paper of October 21, 1902.

Max Blum, for September 25, 1902.

Pippy and Bahrs, for October 21, 1901.

William Loewy, Loewy and Gutsch, for certain heirs.

COFFEY, J. The first paper propounded was filed on October 27, 1902, by C. M. Jennings, attorney for the proponent, Charles W. Fisher, accompanied by a petition for the probate thereof in which it was alleged that one Sophia Casey, a widow, aged about seventy-nine years died testate on October 22, 1902, in this city and county, whereof she was a resident, leaving estate therein and elsewhere within this jurisdiction, real and personal, exceeding in value $10,000 disposed of by a will dated October 21, 1902, executed in due form of law; that at the time of the execution thereof the testatrix was of sound and disposing mind and not acting under duress, menace, fraud or undue influence; that she left no kin in this country; that the names, ages and residences respectively of the legatees and devisees named in the will are as follows:

1. The petitioner, Charles W. Fisher, aged forty-three years, residing at 14 Lexington avenue, San Francisco.

2. Sophia Britton, a minor, daughter of William Johnson Britton and Rosa Cecilia Britton, his wife, residing at 7 Dore street, San Francisco.

3. Mr. and Mrs. Arthur J. Pinkstone, of lawful age, residing at 2533 Mission street, San Francisco.

4. Golden Gate Chapter No. 1, Order of Eastern Star (a benevolent corporation), of and residing in San Francisco.

5. Sophia Schmidt, daughter of Caroline Schmidt (nee

Laubschu), a minor, residing at Berkeley, Alameda county, California.

6. German Old Folks Home, known as the "Deutsches Altenheim," in Fruitvale, Alameda county, California, a benevolent corporation.

7. Anna Maria Eissler, widow, of lawful age, residing at No. 10 Sycamore avenue, San Francisco.

8. The descendants of Adam and Jacob Kammerling, "now or formerly of near the town of Nohfelden, Birkenfeld, Grand Duchy of Oldenburg, Germany, names and ages unknown; identity and residence not otherwise known. The Burgomaster of said town of Nohfelden, or his successor in office, in trust, to ascertain the descendants of said Adam and Jacob Kammerling, and to make distribution unto them."

This petition for probate further alleged that the petitioner Charles W. Fisher and one Joseph Friedlander, both of San Francisco, were named in the paper propounded as executors, and that Fisher consented to act as such but Friedlander had not up to date signified his purpose and petitioner prayed for probate and for his own appointment and that of Friedlander, if he should consent to act in that capacity.

On October 28, 1902, Joseph Friedlander, through his attorney, Max Blum, filed his petition alleging that deceased left a will duly executed on September 25, 1902, which was her last will, and in which he and Charles W. Fisher were named as executors, but that Fisher declined to act and this petitioner consented and asked that letters testamentary be issued to him upon the probate of the instrument.

On November 5, 1902, one H. A. Ph. Bohr, through his attorneys, Pippy and Bahrs, proffered for probate an instrument dated October 21, 1901, purporting to have been executed by the said decedent, in which himself and one Arthur J. Pinkstone were named as executors, and at the same time was filed a codicil dated October 31, 1901, both papers executed with the legal formalities. Bohr asked for letters; Pinkstone did not join. The contents of all of these petitions for probate were substantially similar as to fact and form, which may be more apparent from the subjoined tabulated statement of the three testaments:

| 3d Will. | 2d Will. | 1st Will. |
|---|---|---|
| Charles W. Fisher $5,000 | | |
| 155 acres, Fresno | 155 acres, Fresno | 155 acres, Fresno |
| Valley Street lot | Valley St. lot | |
| 4 trunks | Stamps collec- | Stamps collection. |
| Stamps collection | tion. | Certificate "Chosen |
| All personal property | | Friends." |
| in living rooms. | | |
| Sophia Britton $ 100 | $ 100 | $ 100 |
| Mr. & Mrs. Pinkstone 400 | 400 | 400 |
| Golden Gate Chapter | | |
| No. 1, O. E. S. 100 | 100 | 100 |
| Sophia Schmidt 100 | 100 | 100 |
| Deutsches Altenheim 100 | 100 | 100 |
| Maria Eissler 1,000 | 1,000 | 1,000 |
| Descendants of Adam Kammerling. } One-half of residue. | One-half of residue. | One-half of residue. |
| Descendants of Jacob Kammerling. } One-half of residue. | One-half of residue. | One-half of residue. |
| Executors: | Executors: | Executors: |
| Chas. W. Fisher. Joseph Friedlander. | Joseph Friedlander. Chas. W. Fisher. | H. A. Ph. Bohr. Arthur J. Pinkstone. |
| Witnesses: | Witnesses: | Witnesses: |
| C. M. Jennings, 214 Pine St. Lynette Laemmel, 1810 Pine St. C. W. Card, M. D., 502 Devisadero St. | Joseph Jones, 2121 Mission St. Mrs. Virginia H. Barker, 14 Lexington Ave. | Diedrich A. Brune, 2036 Mission. Chas. Rehn, 2030 Mission. |

On December 1, 1902, acting for himself as the executor of the will of 1901, Bohr filed a contest to the alleged wills of October 21, 1902, and September 25, 1902, in which he alleged as grounds of opposition that each instrument was not duly executed; that at its date testatrix was by reason of her age and infirmities impaired in mind and memory, destitute of testamentary capacity; that she was unduly influenced by Fisher; and that the document did not substantially represent her wishes and that she had no knowledge of its contents.

A similar contest had been filed by the same party, acting as attorney in fact for certain German heirs, on November 24, 1902.

Issues were joined on all the contests and the matters came before the court for hearing on ———, 1902, and by agreement of all the parties and their counsel the various contentions were consolidated.

The important difference in the dispository provisions of the three wills is the item of $5,000 additional legacy given to Charles W. Fisher in the third testament.

There is not apparent any sufficient reason why the testatrix should so soon after the execution of the paper of September 25, 1902, a document drafted with care and skill by the same attorney, execute another will except to add to the Fisher bequests.

According to the evidence of Dr. Charles Wesley Card, a subscribing witness to this instrument and her attending physician, she communicated to him this purpose more than ten days prior to the date of the document. Dr. Card testified that he had been the family physician of Sophia Casey for ten years prior to her decease, and that he had attended her in her last illness, from the 29th of September to the 22d of October, 1902, and saw her every day during that period, sometimes two or three times, and was intimately acquainted with her physical and mental condition; it was he suggested the employment of Lynette Laemmel as nurse, who began her attendance on October 8th and continued thereafter until the end: this lady was also a subscribing witness. Dr. Card said that when the will was to be signed testatrix was given the pen and a little book on which the will was placed before her; she was propped up on the bed and asked to sign her name; she took hold of the pen and got her fingers down on the ink, and then said, "I do not feel strong enough to sign this will," and then Mr. Jennings suggested that the doctor write her name "Sophia Casey," leaving a space between her name and allowing her to make her mark there, which was done; she asked the doctor to sign his name, but he could not remember whether she asked him to sign her name; the doctor could not say whether she asked

him to sign her name, or whether he took the paper and the lawyer asked him to do so, but "it was legitimate anyhow." Dr. Card, after making this remark as to the legitimacy of the transaction, continued to testify that he took the paper and wrote her name and then put the paper back on the little book she had there and she made her cross there; but whether she made any observation at that time the doctor could not say; he saw her make her mark, however, and it was done in the presence of Miss Laemmel, the trained nurse, and Mr. Jennings, the lawyer, the latter of whom said in regard to the inability of Mrs. Casey, through her weakness, to write her own name, that that fact changed the will considerably, as it would involve some writing below the signature to explain the circumstance, and thereupon the lawyer took the document and wrote something down which he subsequently read to the witnesses, but the doctor forgot what it was and did not pay any attention to it, but it was something about why she did not write her name. Upon being urgently admonished by the examining counsel, Mr. Jennings, to stop and think again and tell whether or not Mrs. Casey said anything about anyone signing her name to this paper because she did not feel strong enough to sign it, the witness responded that he could not say; that he could not say positively whether she suggested or whether the lawyer suggested that the doctor sign her name. In answer to another urgent appeal from the examiner, the doctor declared that he did not remember that the testatrix said anything to the lawyer, who had come to the house that morning in response to a telephonic request from the doctor; the lawyer arrived at about half-past 10 o'clock; he came in and took the will out of his pocket and read it over to the decedent and then asked her if that was satisfactory, and she said yes, and then she asked for a pen which was given to have her sign the will. At this point in his examination the examiner, Mr. Jennings, adjured the witness to try and think again and answer if Mrs. Casey did not say something to him, the lawyer, when she found that she was unable to sign the will with her own name herself, but the doctor answered that he did not remember what was said at all; the doctor signed her name

at the request of the lawyer, who showed him how to do it; the doctor was ignorant of the formula and the lawyer instructed him saying: "Write Sophia there and Casey there, leaving a space to put her mark between the names"; the doctor did not remember that Mrs. Casey asked him to write her name or that she said anything at all; she took the will in her hand and read it over and then the lawyer read it to her. In answer to the examiner, Mr. Jennings, who inquired at whose request he read the will to Mrs. Casey, the doctor said it was at her request, "because she could not feel like reading it," "did not feel like reading it; she was very weak." In speaking about some trunks, the testatrix corrected what was in the will and said it should be six trunks instead of four; then the lawyer took the paper and sat down and wrote something below—the doctor did not know what it was, but supposed it was a correction with regard to the number of trunks. Certain blots on the paper were made by the testatrix taking hold of the pen she got her fingers down on the pen and fumbled the paper and then the lawyer took the pen out of her hand; she said "I cannot write my name, I am too weak," and then he took the pen out of her hand. Dr. Card further said in response to the question by the examiner, Mr. Jennings, as to what testatrix said, if anything, about this document when she made her mark: "There was nothing said about its being her will and last testament"; he did not know that Mrs. Casey said anything at all; it was understood it was her will and she had it read to her, and she signed it; it was read to her as her will and that was satisfactory and she proceeded to sign her name there by a cross. The doctor then repeated that there was nothing said that it was her last will and testament at all. Mrs. Casey did not ask the doctor to sign the attestation clause, but she had asked him previously to sign the will, but it was Mr. Jennings who asked him to sign that clause; that addition to the will explaining why she could not write she wished the doctor to sign; she was very weak physically, but the doctor did not apprehend the dissolution to take place so soon—he thought she would last two or three weeks longer; her mental condition that morning was good and clear, she was of sound

mind; she knew what she was doing; she had talked with him as to the execution of this will about a week or ten days previous—in fact, from her first illness when the doctor was called in, she talked the matter over with him; she said that she had a will out and she wished to make a change in it; Mrs. Casey made the remark to the doctor that she was in a lawsuit with a family named Bohr, and her only wish was that she should live long enough to come into court and prove to the judge that they had cheated her out of this four or five thousand dollars, and she only wished the doctor would make her live long enough to get that money back; the doctor testified that he did his best to carry her along, but it went along for a number of days and she was getting worse, and he told her that her sickness looked rather dubious and it was possibly the chance she might not live very long and if she had any papers to take care of she had better do it as she might pass off quickly; her heart was weak; she said she was going to make out a will and wanted to leave money to Mr. Fisher, that she did not suppose he had money enough to go on and fight the case with if she died, she wanted to leave him enough for that purpose; she told the doctor she wanted to make out a will, and he notified Mrs. Fisher that she should notify her lawyer, Mr. Jennings, that he was wanted out there to draw up some papers. This conversation occurred about a week or ten days prior to the decease of Mrs. Casey. The doctor said he saw Mr. Jennings there shortly after he made that request to Mrs. Fisher to notify her lawyer. Mr. Jennings then had a conversation with Mrs. Casey in presence of the doctor about changing the will, and the lawyer told her the contents of the will, and asked what was her wish to have done. Mrs. Casey said: "I want to add to that will $5,000 to be given to Mr. Fisher," and Mr. Jennings asked her whether there was any undue influence brought to bear on her to influence her in any way in changing the will, and she said not.

In answer to a rather suggestive question from the examiner, the witness stated that Mr. Jennings then said to Mrs. Casey that he would prepare the paper at her request and she told the lawyer that of course she was pretty weak and they

would wait awhile, there was no hurry; they did not expect her to die so soon; he said to Mrs. Casey and Mr. Jennings both then and there, "There is no hurry to have this will signed, wait until she gets stronger and she can sign it." and it ran along for a week, and seeing her getting weaker every day and concluding she was not going to recover, the doctor telephoned to the lawyer that he had better come up there and have the will signed, as he did not think she would live very long. This was on Friday, but he could not reach him on that day, so he tried the next day, Saturday, and he was out again. On Sunday the doctor hung up the telephone but on Monday took it down again and caught the lawyer, and an appointment was made for Tuesday at about 10:30 A. M., and at that time the transaction was consummated. For a week prior to that time she was suffering a great deal of pain; she was physically weak and suffering from rheumatism and the doctor had given her opiates to relieve her more or less. The opiates were intended for immediate effect and were given whenever she had pains; they were given for days and days, for a number of days; the instructions to the nurse that when the patient got in violent pain to give her an opiate; the nurse had discretion in this respect; the effect was to induce sleep for from two to four hours; the duration of sleep would depend on the intensity of the pain; if the pain was not severe it would be from six to eight hours, or eight to ten hours; sometimes she got them only once a day; on the morning that this will was executed no opiates were given to her; on the doctor's instruction she was not given any opiates, because he wanted her mind clear, as clear as could be, so she would know what she was doing; for that reason the doctor instructed the nurse not to give the patient any opiates that morning; she was suffering a good deal of pain that morning, but she could talk all right; she had her right mind and conversed and talked as usual, and her voice was about the same as her ordinary tone; at the time the will was executed the doctor understood it was her will but he would not swear whether or not she said so; he took it for granted she was supposed to know without saying so at all; the will was there and it was read to her in his presence and, therefore, he knew

it was a will; she had requested him to be present and sign as a witness, and the paper was signed, or her mark was made, in his presence and in that of Miss Laemmel and Mr. Jennings; but so far as Mrs. Casey making any request at that time of any of the rest of them signing as witnesses, he did not know of her saying anything; the doctor said he did not know the exact words that were used there at all with regard to who should sign it. Upon further questioning by the examining counsel, Mr. Jennings, as to whether or not he knew that Mrs. Casey spoke of the matter at all, the doctor answered that to him she said, "I want you to sign the will," and, "Miss Laemmel, here, the nurse, can sign it also," and of course, the lawyer being present, "will you sign it, also." The doctor did not know that she told him in exact words, but she wanted him to sign that will. The examining counsel undertook to refresh the doctor's memory as to what transpired in the transaction, but was unsuccessful in his endeavor; however, the examiner succeeded in eliciting from the witness an affirmation of his interrogative statement that Mrs. Casey on the morning that she executed this will and while executing it was not acting under the influence of menace or fraud or undue influence of anybody or any misrepresentations. That was the last the doctor saw of her; he forgot whether he saw her the same evening or not; he left about noon and was not there again; after the execution of the will he ordered an opiate given and it was administered; he directed the nurse to give an opiate as frequently as the patient had pain; if she had very much pain to administer an opiate to keep her out of misery. The doctor answered the examiner that he first considered her case critical—that is, that her death might occur within a short time—when he telephoned to the lawyer to come up and have the will attended to; the doctor then began to realize that she was getting serious and if she had any business she should attend to it. This was on the Friday before her death. In answer to a pressing and repeated inquiry from the examiner, the doctor said that he could not remember the occasion of the lawyer's call upon Mrs. Casey a week or ten days prior to her death when a conversation was had between her and the attorney, when she

stated the changes she wanted made in her will and said something about calling to the lawyer's office to execute it; he could not remember anything on that subject at all. Mrs. Casey told the doctor the whole story of her trouble with the Bohr family; she said that she had lent Bohr some money, somewhere between four and five thousand dollars, and when she asked him for a mortgage he refused to give it and said he did not obtain any money from her; she said she was going to take it into court and fight it; she drew the money and gave it to him on the understanding that she was to have security, and when she demanded security Bohr refused to give it to her and she said she was going to recover it if she possibly could; this was the gist of her statement to the doctor, who thought that the dispute between herself and the Bohrs affected her health injuriously, and that it was the means of hastening her death and that it broke her right down physically; it worried her very much; the minute the doctor went into her room the first subject she would touch was the Bohr family and how they beat her out of the money. The doctor testified that he saw Miss Laemmel and Mr. Jennings sign the will as witnesses, at the same time; testatrix was awake and the signers were right near her head; she was conscious of what was going on; she was a woman of strong will power. The doctor had suggested the employment of Miss Laemmel as nurse; she kept a clinical record which he inspected every day and which the doctor had in his possession and produced on the stand at the request of the cross-examiner, Mr. Blum. In response to this cross-examining counsel, the doctor said that this document constituted the entire record that was kept. The opiates ordinarily administered were pulverized opium as a suppository and morphine capsules; the suppositories were compound prescriptions; the doctor would ordinarily interrogate the nurse about the record when he called; champagne was given to the patient during the period of the nurse's attendance; the nurse had the privilege of giving medicine at her discretion; the doctor's instructions were to give an opiate as the patient needed it, when she was in violent pain. On the occasion of his visit last prior to the making of the

will, he told the nurse not to give an opiate in the morning of the 21st, because he expected the attorney there to attend to this matter and they wanted her mind clear. He called later that morning at about 10 o'clock and was there when the lawyer arrived; Mr. Jennings came in at about half-past 10. The matter of the will occupied probably an hour, but he did not gauge the time by his watch. Mr. Jennings left first and the doctor remained a short while afterward and ordered an opiate given to the patient and waited to observe its operation and then departed. If an opiate had been administered that morning prior to his arrival, the doctor testified he would have been able to know it, even if he were not told so. Opiates ordinarily took effect quite promptly on Mrs. Casey, and the dose of morphine that he was in the habit of administering to her would take from two to four hours to wear off, so that if an opiate had been given to her prior to his arrival that morning he would have been able to detect that fact. But it appears from the clinical record, produced on the witness-stand by the doctor on cross-examination, that there had been an opiate given to the patient that very morning at twenty minutes past 10 o'clock by the nurse, Miss Laemmel, who testifies that at that hour she administered to Mrs. Casey a reduced dose of only two-thirds of a capsule, the full dose usually given being one-fourth of a grain; according to this clinical chart the patient had "cried out with pain in right leg" just before this medicine was given. The chart does not indicate the contents of the capsule, but the nurse testified that the ordinary quantity was one-fourth of a grain, and there is nothing in the note of the amount administered at 10:20 A. M. of October 21st, 1902, to show that it was more or less than one capsule of the customary content.

Dr. Henry Harris testified that he made a visit with Joseph Friedlander on the evening of October 21, 1902, to the house of Mrs. Casey, whom he was asked to see by that gentleman; they entered the house together but were not immediately admitted, as the trained nurse in charge of the case made certain objections, saying that the attending physician had left orders that no one should see the patient. After

some demur and parley they were admitted to the apartment of the patient; this was at 8:40 P. M., according to his timepiece; they saw the lady, who was in bed; Dr. Harris fixed the time of his visit from data or what he denominated a "protocol" that he made. The patient was profoundly unconscious—that is to say, she was incapable of being aroused by questions addressed to her in a loud tone; she was not conscious during the ten minutes they were in the room; during this time Dr. Harris had a conversation with the trained nurse in which she informed him that she had kept a clinical record, which she exhibited; on that record or chart, which this witness identified, there was entered an item on the date of Tuesday, 22-x-'02, 10:20, "champagne," then a medical sign meaning two ounces, then the word "cap.," abbreviation for capsule, followed by the figure 1 in parenthesis, thus (1); the nurse volunteered the statement that this capsule contained grains one-fourth of morphine; this witness was positive from his protocol and from his independent recollection that the trained nurse had told him that that particular capsule contained one-quarter of a grain of morphine; as he was looking over the clinical chart she volunteered the information that at 10:20 that morning the patient had received a capsule containing morphia, grains one-quarter, such a record having been there shown. Dr. Harris swore that he knew nothing about the testimony given in the case by the nurse, Miss Laemmel, or the attending physician, Dr. Card.

Miss Laemmel denies that she made any such statement and avers that what she did say to this physician was different. Upon the occasion of his call and after he and Mr. Friedlander had looked at the patient and called to her and Friedlander walked out of the room, Harris remained and turned around and began looking at Mrs. Casey, and the nurse said to him, "you know, doctor, she is under the influence of opiates," but she said nothing about any particular opiate, nor the amount of morphia; it was opium that was administered.

There is here a conflict between Dr. Harris and Miss Laemmel, but wherever the truth lies between them, it is

plain that an opiate was given at that hour, notwithstanding
Dr. Card's positive assertion that if such were the case
he would have detected it. Whatever the quantity given it
is clear the patient was suffering intense pain and it was
necessary to alleviate her distress, and it required, as a rule,
according to Dr. Card and the nurse, a full dose to ac-
complish that purpose. What effect did this dose have upon
her? Was she after this ministration mentally active as
usual? Was her mind in its normal state—that is, was it
able to operate according to the principles which govern the
intellect in its healthy and natural condition? Was her in-
telligence intact and her volition dominant? Were her fac-
ulties full and her consciousness complete? Confessedly her
body was unsound; had she a sound mind when this instru-
ment was executed? Whether the clinical record of the nurse
can be relied upon or not, whether at 10:20 A. M. on Octo-
ber 21, 1902, one quarter of a grain of morphia was given
to the testatrix, which would have put her into a stupor
at 10:30 A. M. when the instrument was executed, or whether
a reduced quantity of the anodyne was administered, she
had been suffering excruciating bodily pain to relieve which
the drug was given. The doctor had directed the nurse to
omit the potion on that morning, so that the patient's mind
might be clear, but it seems Miss Laemmel deemed it neces-
sary in her discretion to depart from this direction on ac-
count of the agony which her charge was suffering. Accord-
ing to the evidence of Dr. Card, a full dose was essential
for repose and its effect would be immediate, lasting from two
to four hours; inferentially, a reduced quantity would have
its proportionate effect.

What does the nurse say as to the facts and circumstances
of this case and her relation to the subject matter? Miss
Laemmel seems to be an educated and intelligent woman,
whose calling compels closeness of observation of the occur-
rences of the sickroom and strictness of attention as to the
condition and conduct of the patient. She testified that Dr.
Card had instructed her on the day before the will was
made to give no opiates to Mrs. Casey until the document
should be signed, because he wanted her mind clear; the

doctor told her the lawyer was to come the next morning; the nurse was there when he came, at that time the mind of the patient was good and clear; it was between 10 and 11 o'clock when the attorney arrived; he read the will to Mrs. Casey and asked her to listen, and then there was a mistake in the will about some trunks and she corrected that and it was changed; she was lying on the couch and the lawyer was sitting beside her when he was reading; after the correction was made she wanted to be propped up to sign the will and the nurse placed her in that posture; she asked for her pillows and then she took the pen in her hand and she had the book under the will and the lawyer held the book; she made two blots on the paper and she said she could not hold the pen; said she was weak, "or something to that effect," "she intimated she could not sign," and asked the attorney to do it; he did not want to do it and did not do it; the nurse could not remember whether the lawyer said anything to Mrs. Casey as to who could do it or who ought to do it, but finally Dr. Card signed it. After successive entreaties from the examiner to the witness to try and remember about this matter, the nurse having said at first that she thought that the lawyer told Mrs. Casey that Dr. Card could sign it for her, but she did not remember the particulars of that incident; she at length answered in response to the specific inquiry: "Well, try and remember about that. Do you remember that I told her that Dr. Card could sign it for her? Yes, sir, very positive," and then the doctor signed the name "Sophia Casey."

In answer to a question which suggested that at this time the doctor was standing right by the bedside of Mrs. Casey and the lawyer standing by her, the witness said no, she thought he wrote standing up in front of a table by the window; the lawyer told the doctor where to put the patient's name and to leave the space for a cross, and then it was handed back to her and she made the cross with a pen; she was still on the couch; the witness could not remember that Mrs. Casey said anything at the time and did not remember how long it took to read the will to her; the nurse was standing in front of the lawyer and the doctor was beside her;

after the patient made her mark the lawyer took the paper to the table and wrote something to signify that she could not write her name, and after he did that he read it and then they signed their names.

Miss Laemmel was of opinion that Mrs. Casey was of sound mind at that time, as at all times when she was not under the influence of a full dose; there was no set time for the administration of the opiates—they were given when necessary; the nurse gave about two-thirds of a capsule on the morning of the 21st at 10:20, a third less than the customary capsule; despite the doctor's direction to the contrary she gave this opiate because the patient was in great pain and cried out for relief; she was in pain-before and after this opiate; it did not stupefy her or put her to sleep at all; it did not cloud or affect her mind; the opiate was lessened in quantity purposely so as not to induce a state of stupor; she was in pain all that morning and made outcries signifying her suffering; the witness could not remember the exact words addressed to the patient by the attorney; it was something about her last will and testament or that kind of legal talk, and testatrix said "yes," as near as the nurse could remember, "she intimated yes"; what the patient answered the nurse could not remember, but she knew that the testatrix "was satisfied with everything that went on that morning all the way through"; after the execution of the will another opiate was given, opium or morphine, a full capsule, under direction of Dr. Card who was present; Mr. Jennings had gone away; this was at 11:30 A. M.; it took longer than usual to take effect because she was in severe pain.; more than one was given before any effect could be had upon her, she took still another later. The date in the clinical record "22" should be "21"; the true date should be the 21st; it was Tuesday, 21st October, 1902; the nurse had not slept much at night and had the dates mixed on that account; at 2 in the afternoon one suppository was administered and the witness remembered giving the patient an opiate in the evening at about 7 o'clock; it was about half-past 8 or 9 when Mr. Friedlander and Dr. Harris called; Mrs. Casey was then sleeping as a consequence of taking the opiates; after some ob-

jection on her part she admitted them; after they had looked at her, Friedlander spoke to her, and attempts were made to arouse her without avail. Dr. Harris asked some questions, felt her pulse, examined the clinical record, made some memoranda. Mr. Friedlander said he would return sometime when she would not be under the influence of an opiate, but of course no set time could be given in such a case, "because there is no set time for pain"; no one else was present during this conversation than the two visitors and herself and the sleeping patient; Mr. Fisher was out in the hall.

After the departure of these callers, the patient took nourishment up until 12 o'clock and she seemed just about as usual; from midnight a change took place, and at 3:15 in the morning of the 22d she died.

Miss Laemmel told Dr. Card that she had given the patient an opiate that morning; she so informed him immediately upon his arrival; she remembered very distinctly that she apprised the doctor of that fact so soon as he came in on the morning of October 21st, 1902.

The witness described the gentleman who came in with Mr. Friedlander as "the little doctor," because he was diminutive in stature as compared with the other, who was such a large man; she learned that his name was Dr. Henry Harris. At the time they came in the patient was sleeping from the effects of the opiates, "she was under the influence of an opiate; she was doped"; the witness in answer to a question repeated the expression "doped." "Question: Who doped her? Answer: I did"; she had a full dose—that is to say, of opium or morphine; she had a whole capsule given in the evening, consequently she was asleep from its influence.

During the intervals of Miss Laemmel's absence from her duties as nurse, Mr. Fisher attended to the patient; when she went to her meals which occupied about one hour three times each day he was alone with Mrs. Casey; at least three hours every day; the patient slept a great deal; he never made any special note of her being unconscious; he conversed with her frequently about many things; she would talk about the Bohr case, and about going to Vallejo or Napa Springs or some other place; Fisher never broached the Bohr business

to Mrs. Casey unless she began to talk on that topic, he never alluded to it; he had told her the litigation was getting on all right; sometime along in October he first learned from her that she intended to make a will and leave him $5,000 to fight the case, but he did not tell her that the amount was excessive for that purpose; she had also stated that when she was done with her property she intended to leave it to him, for he had been like a son to her and had taken care of her business and herself and she intended to remember it.

Some of the items on the clinical records are in Fisher's handwriting, and he was in almost constant attendance, always at call, in and out of the sick room noting different things that she would need, waiting on her when necessary, and ministering to her need in the absence of the trained nurse.

Fisher testified that she had made more than one will in which he was the recipient of a legacy of $10,000; but nothing more than his bare statement is in evidence on this point. In view of the estimated value of the estate, such a provision for him would have been equivalent to excluding her relatives from any participation in her property, and nothing is clearer throughout than her intention to provide for them. All the wills in evidence, and the fragment of a will in which her kin and their places of residence are enumerated in detail, which were made prior to her last sickness carry out consistently her intention as to her relatives.

As to the provision for Fisher, it seems to have been generous in all the wills, more than he had any real claim to, and the assertion that he occupied a filial relation to the decedent, a sort of adopted son, is not borne out by the evidence. Mrs. Pinkstone's testimony is that Mrs. Casey never referred to him as her son; he was simply her agent and the receipts given by him to her seem to show that he was paid for his services; she was under no natural or other obligation to provide for him; but he evidently had acquired influence over her which he was in a position to exercise testamentarily.

From the 29th of September, 1902, until her death Fisher was with her day and night; he had the opportunity of unduly influencing her, and while the law will not presume the ex-

ertion of undue influence from the mere fact of opportunity or a motive for its exercise, nor permit it to be found upon suspicion, yet the proof must generally be gathered from the circumstances of the case, for very seldom is a direct act of influence patent, as a person intending to control another's action, especially as to a will, is not apt to proclaim that intent; and among the circumstances from which proof must generally be gathered of undue influence exercised upon a testator are: (a) Whether he had formerly intended a different testamentary disposition; (b) whether he was surrounded by those having an object to accomplish to the exclusion of others; (c) whether he was of such weak mind as to be subject to influence; (d) whether the alleged will is such a one as would probably be urged upon him by those surrounding him; (e) whether the persons who surrounded him were benefited by the alleged will to the exclusion of formerly intended beneficiaries.

That the mind of the decedent was intent upon her German kin is shown by her persistent purpose throughout the series of wills in providing for them up to the last document in which Fisher is more favored. The circumstances conspire to the conclusion that he was always using influence in one way or other, above the usual persuasion of a friend, to divert her own design to provide for her relatives; that such was his object and scheme may be seen from numerous items in evidence. The testimony of Mrs. Adelseck, her son and Mrs. Eissler tend to establish this issue, and the incidents at Redwood and Sunol show his willingness and endeavor to influence her last disposition, at a time when by reason of her age and ailments she had lost her will power; and the suspicion of the lawyer himself, the draftsman of the will, is significant and suggestive when he asked decedent if anybody had used undue influence over her—an unusual question for an attorney to ask of a person in her situation.

Mr. Jennings, the attorney for proponent, who had sole charge of the case for the will of October 21,. 1902, offered himself as a witness in that behalf, and gave a long and circumstantial account of his connection with the matter from the start. His acquaintance with the decedent began on the

tenth day of September, 1902; subsequently he prepared several wills for her at her request—four at least, perhaps five, two of which she executed, in his presence. He was called to her house by her on the 19th of September, 1902, and in response to that call and before the 25th of September, he drew three wills for her which were submitted to her in the interim; the third or fourth, he was not positive which, she executed on the 25th of September, being the same instrument that is offered here for probate by Mr. Friedlander, one of the executors named therein. On the 10th of October Mr. Jennings visited Mrs. Casey in response to her request; he was not sure whether it was a telephonic message or whether Mr. Fisher personally came to him, but the statement was that she wanted to make some changes in her will; the document executed on the 25th of September had been deposited with Mr. Friedlander at her request and was thereafter continuously in the custody of that gentleman, upon whom Mr. Jennings called and told him that he had been summoned by Mrs. Casey to make some change in her will and asked him if he would intrust him with the paper for that purpose. Mr. Friedlander said he did not feel like giving it without a written order, but Mr. Jennings had no such order. On the morning of the 10th, however, the lawyer called on her and found her lying on the couch; she greeted him as he entered and bowed and smiled; he sat down by her side, took a pamphlet out of his pocket and in response to her statements concerning the will made certain memoranda; in pursuance of the instructions received from her on that occasion he prepared another will for her entirely not having the one previously executed in his possession. Mr. Friedlander still retained that document, refusing to yield it without a written order from the testatrix, and the lawyer had no written order nor authority of any kind from Mrs. Casey to obtain that instrument, so he had to do without it. After preparing an entirely new will for her, Mrs. Casey said to the attorney that she would send for him when she was ready to execute it, or she would go down to his office for that purpose.

On the 20th of October, 1902, Mr. Jennings received a telephonic communication from Dr. Card, asking him to go out as Mrs. Casey desired to execute her will and to bring the document with him for that purpose; he fixed 10:30 next morning himself as the time for calling, and he arrived there about that time; he entered the room; the first person he greeted was Mrs. Casey who was looking toward him as he walked in; she smiled recognition and as he approached held out her hand, and he sat beside her, having said "Good morning; how are you?" Mrs. Casey asked him if he had brought the will, and he replied that he had and took it out of his pocket and handed it to her; she held it in her hand a second or so, then opened it, and looked at it; she turned over each sheet and then asked him to read it; he called Dr. Card and Miss Laemmel, who were both in the room, to come and be witnesses to his reading; they came, he read the will to Mrs. Casey; read each word to her carefully; when he reached the portion bequeathing Mr. Fisher $5,000, he read that to her with a slow emphasis and he stopped and read it to her again, and then remarked to her, "I think, Mrs. Casey, that is the only change made in the will, the only change in the verbiage of the will, perhaps"; she bowed assent to that; he continued reading the same clause and got down to the point where it said "four trunks"; she stopped him almost immediately after the word "four—four trunks," and she said "six trunks"; he said to her that he would change that right then and he made the change then and there; she said "six trunks and the furniture here," and he altered accordingly; he then read it over to her and she said, "That is right"; he then continued reading the will and when he finished, she said: "That is all right"; he asked two or three times; she did use the word "satisfied," "that is all right now," "I am satisfied"; he asked her if she wished to sign it and she replied, "Yes, I want a pen"; the pen and ink were handed to her; the will was placed on a book in front of her, she in the meantime requested to be propped up and the nurse did so, and Mrs. Casey took the pen in her own hand and put it down upon the paper; her hand trembled quite a great deal; she made a blot or two, then remarked that she was too

weak to wiite; she then asked the attorney, "Cannot you write it for me?" He said he could if she would direct him, but he would rather not, that there was her lifelong friend, the doctor, to ask him; she said to the lawyer, "Can the doctor sign my name?" And was answered that he could if she would direct him to do so; she then directed the doctor, who has forgotten that fact in his testimony; Dr. Card was within three feet of her; Mr. Jennings said to him, "She wants you to sign her name, Doctor," who asked if he could do it legally, and he was informed that he could, she directing it to be done; the doctor asked the lawyer where and how, and he was shown; he did so standing up, then the paper was returned to the testatrix and the attorney asked her if she could make her mark, she said she could; the will was placed upon a book before her; she took the pen again in her hand, the lawyer being very close to her and she was leaning slightly behind him. Mr. Jennings then said, according to his testimony, "Now, do you declare this to be your last will and testament?" She said, "I do"; he then said, "I want you to repeat the words yourself," and she repeated, "I declare this to be my last will and testament"; he then asked, "Do you want the doctor and this lady to sign the will as witnesses?" And she replied, "I want you all to sign it"; the attorney then said to the doctor and to Miss Laemmel, "She wants us all to sign it; will you sign it as witnesses?" Each signified acquiescence and signed. Mr. Jennings mentioned, when Mrs. Casey said that she could not write her name, that he would have to make an addition to the attestation clause covering the fact that she herself did not sign her name but made her mark, and after that he went to a table in the bay window and wrote the addendum; then they all subjoined their names as witnesses. The attorney had taken the will to Mrs. Casey ready to be executed under the supposition that she would be able to write her own name, and the attestation clause was prepared upon that assumption. Testatrix spoke in a low tone of voice, she did not speak very loudly, yet, notwithstanding that Mr. Jennings has himself an infirmity of hearing, he testifies that he could hear her quite distinctly, since he was seated close to her. After the

execution of the will, testatrix told him to take it down to Mr. Friedlander, and after a few minutes delay he departed and proceeded to the Anglo-California Bank, where that gentleman was engaged, and related to him what Mrs. Casey had done, and said that he had her last will executed that morning, which she directed him to deposit with Mr. Friedlander; that gentleman hesitated, saying that he had been informed she was very ill; the lawyer said she was, and coupled the condition of depositing the will with Mr. Friedlander that he should give a receipt for it, which he declined to do. The attorney said that he would have to retain possession of the document unless he could secure a receipt for it showing what he had done with it, whereupon Mr. Friedlander asked if the lawyer had any objection to leaving the will until some time in the afternoon, when in the meantime he should consult his attorney, there was no objection to this course, and the instrument was left without any receipt; subsequently on the same afternoon, at about 3 or 4 o'clock, the lawyer again waited on Mr. Friedlander to obtain his final decision about the receipt which he still refused to give, so the attorney declined to leave it with him, and taking it back placed it in his own safe deposit box, where it remained until it was produced and filed in court. During all the period of his acquaintance with her, Mr. Jennings testified that testatrix was of sound mind.

The attending physician and the nurse testify that the mind of the testatrix was always clear, and yet neither of them could say even approximately how much of the time she was awake or in stupor. The physician could not testify whether on any day between the 10th and 20th of October he found her awake or asleep. His final reason for knowing that she heard and understood the entire instrument, the reading of which, as he testified, was continuous, without stops, was that she had her eyes open; but, so far as these witnesses are to be depended upon, the proof is far from satisfactory as to the mental condition of the testatrix.

Here was a woman almost four score years of age exhausted in body, distracted in mind by her disease, suffering untold agony, relieved only by the administering of power-

ful opiates, which, as a rule, induced immediate stupor, subjected to the strain of circumstances necessarily attendant upon so solemn a transaction, with a brain enfeebled by age and debilitated by drugs, and yet it is asserted that she was of sound mind and fully competent to make her will, and the subscribing witnesses are relied upon to establish that fact. The execution of a will at so recent a date by a woman on the last day of her life, during the last hour of her alleged consciousness, is an experience which even those who are frequently called upon to attest wills are not apt to forget; so much more should the incidents of such an event fasten themselves upon the memory of persons who for the first time act as attesting witnesses.

It was the duty of these witnesses, by reason of their vocation, to be vigilant and attentive to details. According to the testimony of each, the testatrix was not expected to survive long, she might die at any time; the doctor had been striving to call up the lawyer several days previously because of his apprehension of the nearness of the event, and now when the attorney was in attendance in the exercise of his calling, when their attention was urgently directed to all the minutiae of the execution of the will, it was of the utmost importance that their own consciousness should be clear and their memory active as to what occurred. But their recollection could not be aroused into activity, even under the pressure of leading questions which certainly should have awakened the most dormant faculty.

Mr. Jennings' own admitted infirmity of hearing must have necessitated a more than ordinary loudness of tone from the feeble old lady on her deathbed, and that circumstance of itself should have impressed indelibly the minds of such intelligent witnesses and participants in the ceremony; but they cannot recall the facts as narrated by him.

It seems scarcely possible that, in these circumstances, the instruction given by him to the testatrix as to the manner of acknowledging the execution of the will and her repeating in an audible voice, "I declare this to be my last will and testament," should have been utterly forgotten by the attending physician and the trained nurse, knowing, as

they did, that they were to attest the last will of that dying woman.

Dr. Card testified that there was nothing said about its being her will and last testament; he did not know that the decedent said anything at all, and he repeated in his testimony, as hereinabove narrated, that there was nothing said that it was her last will and testament at all; he took it for granted she was supposed to know without saying so at all. The nurse, Miss Laemmel, testified in answer to the question that the patient "intimated yes," but she could not remember more definitely or distinctly. The attestation clause sheds no light upon the situation, for the doctor testified that when it was read to them by the lawyer, he paid no attention to it and the nurse was about equally inattentive. Neither sustains the attorney as to what occurred as to the essentials of execution. If he admonished them, as he testifies, and if the declaration of decedent was really made in the formal manner related by him, and the words ascribed to her were spoken by Mrs. Casey, it is passing strange that they being present and close to her side, with their attention specially challenged to the occurrence, cannot remember the substance, even if they forgot the tenor; but they unite in the statement that she said nothing on the subject and made no request of them to sign as witnesses or declaration as to the character of the instrument. If the declaration and remarks imputed to her were made, the witnesses either could not have been present or they must have heard them. If they were present and did not hear, because they paid no attention to the act, the execution was defective. It is not merely a matter of entire lack of memory. The existence of the essential facts of the execution and acknowledgment is not to be deduced at all from their want of recollection: the effect of their evidence is, that what the attorney testified to regarding the declaration of decedent did not take place at all or did not occur in their physical or mental presence; they were absent either in body or in mind. The testimony of the doctor admits of no other explanation; and the statements of the nurse are scarcely less conclusive. The failure of memory or the indifference or the want of attention of the doctor

and the nurse as to facts of such paramount consequence, which it was their duty to note with care, and concerning which they are said to have been cautioned, necessarily impairs the value of their testimony as to the condition of mind of the decedent at the time of the transaction; but even if there had been in form an acknowledgment of the will by decedent, its valid execution cannot be determined alone by what was said or what may have been said by her at that time; it can be determined only by considering what was the condition of her mind at the time.

What was that condition? The clinical chart contains matter of significance that cannot be gainsaid; if its insertions are to be taken as true, then at the time the will of October 21, 1902, is alleged to have been executed the decedent could have had no volition and no power of reasoning whatever; she must have been, in the phrase of the witness, Mrs. Eissler, "too dead" to do or say anything, much less indulge in the formal dictation of a testamentary declaration.

The clinical record is pregnant proof to this point, and notwithstanding the testimony of the nurse, in her endeavor to falsify her own entry as to the amount of morphia administered by her at 10:20 on the morning of that day, the intrinsic probability of the chart conveys conviction to the mind. Her testimony, however, is materially affected by the evidence of Dr. Harris as to the statement she made to him on the evening of that day when he, in company with Mr. Friedlander, visited Mrs. Casey and found her profoundly unconscious and irresponsive to every attempt to arouse her. The nurse used one word that expressed her own judgment of the condition of the decedent at that time; she said Mrs. Casey was "doped" by her; and the chart demonstrates that the extraordinary amount of morphia and champagne given to the patient on that day was because she was so agonized by pain as to necessitate narcotization. Even if the dose given to her at 10:20 o'clock on that morning was a reduced one, she was still at the time of the alleged execution of the will in a highly narcotized condition; she could not have had that clear mind to secure which Dr. Card prohibited the prescription, which prohibition the nurse felt constrained to dis-

obey because of the patient's outcries, symptomatic of intolerable anguish. Now, if her bodily torture was diminished by the opiate, her mental power must have been lessened, because the effect of the drug was to allay pain by abating sensibility. The purpose of the prescription was to dull the sense of torment, and so far as it was efficacious it clouded her mind. If it did not perform that office, it was useless to administer it; and when the doctor forbade the nurse to give any opiate to the patient, because he wanted her mind to be clear that morning, he conceded that its effect would be to darken, if not temporarily to destroy, the understanding of the decedent. His own testimony shows his idea, when he positively declared that no opiate had been administered that morning, for if it had, he could have detected it, in face of the fact that the nurse admitted and the chart showed the contrary.

Whether a full dose, an entire capsule, or only two-thirds thereof, was administered to decedent at the hour of 10:20 o'clock on that morning, she was not in a state of mind calculated to capacitate her for so grave an affair. She was either in a stupor from a full dose or partially stupefied and distraught with pain so far as she was sensible of her condition, and in either case she could not have had a sound and disposing mind at the time of the event in issue. From the combined effect of her sickness, the frequent administration of opiates, the intensity of her pains, and the other influences acting upon her will and understanding, she must have been at that time incapable of voluntary and intelligent disposition. It is deducible by fair inference from the circumstances already adverted to, that the document dated October 21, 1902, was inspired by the proponent; that his was the active agency in its creation; his was the dominant influence that inspired its construction. A careful examination of the evidence will justify a finding that Fisher was the informing spirit of this testament and that it was his will, rather than that of the nominal testatrix. In the view taken by the court, the feud between Fisher and the Bohrs is not interesting nor relevant, except as it emits some scintilla of light on the main issue.

The preponderance of proof is that the instrument dated October 21, 1902, was not the free and conscious act of the decedent, and it must, therefore, be denied probate. In relation to the document of September 25, 1902, the contest is not sustained, and upon the whole record that paper seems to be established and it is admitted as her last will.

---

**The Undue Influence Which Invalidates a Will** must be such as relates to the will itself, and operates upon the testator at the time of his making the will: Estate of Kaufman, 117 Cal. 288, 59 Am. St. Rep. 179, 49 Pac. 191; Estate of Flint, 100 Cal. 391, 34 Pac. 863; Estate of Shell, 28 Colo. 167, 89 Am. St. Rep. 181, 63 Pac. 413, 53 L. R. A. 387; Gwin v. Gwin, 5 Idaho, 271, 48 Pac. 295; Estate of Holman, 42 Or. 345, 70 Pac. 908. General influence, not directly brought to bear upon the testamentary act, though strong and controlling, is not enough: Estate of McDevitt, 95 Cal. 17, 30 Pac. 101; Estate of Black, 132 Cal. 392, 64 Pac. 695; Estate of Donovan, 140 Cal. 390, 73 Pac. 1081; In re Darst's Will, 34 Or. 58, 54 Pac. 947. The influence must be used directly to procure the will, and must amount to coercion destroying the free agency of the testator at the time of the execution of the instrument: Estate of Carpenter, 94 Cal. 406, 29 Pac. 1101; Estate of Motz, 136 Cal. 558, 69 Pac. 294; Estate of Keegan, 139 Cal. 123, 72 Pac. 828; Goodwin v. Goodwin, 59 Cal. 561; Hurley v. O'Brien, 34 Or. 58, 54 Pac. 947; Estate of Holman, 42 Or. 345, 70 Pac. 908; Waddington v. Busby, 45 N. J. Eq. 173, 14 Am. St. Rep. 706, 16 Atl. 690.

**When a Will is Contested on the Ground of Undue Influence,** the burden of proof is generally on the contestant: Estate of Motz, 136 Cal. 558, 69 Pac. 294; Estate of Latour, 140 Cal. 414, 73 Pac. 1070, 74 Pac. 441; Dausman v. Rankin, 189 Mo. 677, 107 Am. St. Rep. 391, 88 S. W. 696; note to Richmond's Appeal, 21 Am. St. Rep. 94, 104. See, however, Estate of Holman, 42 Or. 345, 70 Pac. 908. Such influence cannot be inferred merely from opportunity and motive: Herwick v. Langford, 108 Cal. 608, 41 Pac. 701; Estate of Nelson, 132 Cal. 182, 64 Pac. 294; Estate of Black, 132 Cal. 392, 64 Pac. 695; Estate of Donovan, 140 Cal. 390, 73 Pac. 1081; Estate of Shell, 28 Colo. 167, 89 Am. St. Rep. 181, 63 Pac. 413, 53 L. R. A. 387; Hubbard v. Hubbard, 7 Or. 42. But while undue influence is not presumed, still, like fraud, it rarely is susceptible of proof by direct and positive evidence. Hence it is that courts are liberal in allowing a wide range of investigation, and permitting the introduction in evidence of all facts and circumstances, even though of slight significance in themselves, which tend to throw light upon the issue: Clough v. Clough, 10 Colo. App. 433, 51 Pac. 513; Blackman v. Edsall, 17 Colo. App. 429, 68 Pac. 790; Estate of Shell, 28 Colo. 167, 89 Am. St. Rep. 181, 63 Pac. 413, 53 L. R. A. 387; Dausman

v. Rankin, 189 Mo. 677, 107 Am. St. Rep. 391, 88 S. W. 696. However, although circumstantial evidence may be sufficient, it must amount to proof; and it has the force of proof only when circumstances are proved which are inconsistent with the claim that the will was the spontaneous act of the testator: Estate of McDevitt, 95 Cal. 17, 30 Pac. 101; Estate of Calkins, 112 Cal. 296, 44 Pac. 577.

"The question of undue influence is one of peculiar character; it does not arise until after the death of the one who alone fully knows the influences which have produced the instrument; it does not touch the outward act, the form of the instrument, the signature, the acknowledgment; it enters the shadowy land of the mind in search of its condition and processes. . . . . This opens a broad field of inquiry and gives to such a contest over a will a wider scope of investigation than exists in ordinary litigation": Mooney v. Olsen, 22 Kan. 69, approved in Estate of Miller (Utah), 88 Pac. 338. For cases considering the sufficiency of the evidence to establish undue influence, see Estate of Welch, 6 Cal. App. 44, 91 Pac. 336; Estate of Carrigar, 104 Cal. 81, 37 Pac. 785; Estate of Silvaney, 127 Cal. 226, 59 Pac. 571; Estate of Kendrick, 130 Cal. 360, 62 Pac. 605; Estate of Tibbetts, 137 Cal. 123, 69 Pac. 978; Estate of Calef, 139 Cal. 676, 73 Pac. 539; Estate of Morey, 147 Cal. 495, 82 Pac. 57; Ames v. Ames, 40 Or. 495, 67 Pac. 737; Estate of Abel (Nev.), 93 Pac. 227.

In Determining the Capacity of a Person to Make a Valid Will, the state of his mind, not the condition of his body, is the object of inquiry. An individual may be in a state of extreme physical weakness and imbecility, he may be in great distress and pain, he may be broken in health or mortally ill, and yet so far retain his mental faculties as to possess testamentary capacity. Furthermore, the fact that one is far advanced in years, and is not immune from the infirmities incident to old age, does not render him incompetent to execute a will. It may be conceded that bodily infirmities may be taken into account in determining whether or not the testator actually was mentally incompetent to make a will, or whether or not he was swayed by undue influences in making the disposition of his property which he did, but of themselves they do not establish testamentary incapacity: 1 Ross on Probate Law and Practice, 24, citing numerous authorities.